430 So.2d 285 (1983)
Carl D. PAUL, Plaintiff-Appellant,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, et al., Defendants-Appellees.
No. 82-665.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1983.
*286 Ford & Nugent, Howard N. Nugent, Alexandria, for plaintiff-appellant.
Provosty, Sadler & deLaunay, Albin A. Provosty and F. Rae Swent, Alexandria, for defendant-appellee.
Before DOMENGEAUX, LABORDE and YELVERTON, JJ.
DOMENGEAUX, Judge.
This medical malpractice suit was filed by Carl D. Paul, individually, and for the use and benefit of his minor daughter, LaDonna L. Paul, against the Succession of Dr. Louis Cayer, St. Paul Fire & Marine Insurance Company, Rapides General Hospital, and United States Fidelity & Guaranty Company (U.S.F. & G.).[1] Plaintiff sought relief for the alleged negligence of Doctor Cayer, an orthopedic surgeon, in his treatment of LaDonna Paul for injuries she received on January 17, 1976. From a judgment rendered in favor of the defendants, the plaintiff has devolutively appealed to this Court.
On the day of the accident, LaDonna Paul fell from a tree in the yard of her home in DeVille, Louisiana. She was taken by her mother to the emergency room at Rapides General Hospital where she was examined by Dr. Louis Cayer. Doctor Cayer diagnosed multiple fractures of the left wrist and elbow after viewing x-rays of the patient's arm. He thereafter manipulated the fracture and applied a long arm cast, rejecting surgery as a first course of treatment. He administered a shot to the child for pain and admitted her for observation. He told Mr. and Mrs. Paul that he would return the next morning to place the youngster's arm in a sling and that she could go home thereafter. Doctor Cayer instructed the nursing staff to observe the patient's fingers for temperature change and discoloration every two hours, and to contact him if circulation was embarrassed.
The present suit stems from the fact that Doctor Cayer did not return after he admitted LaDonna at approximately 10:30 P.M. on January 17th. His absence went unexplained until Monday, January 19, 1976, when it was discovered that Doctor Cayer was dead. On Monday evening, Dr. Douglas Gamburg, also an orthopedic surgeon, took over LaDonna's case. After examining *287 the patient, Doctor Gamburg decided to remove the cast which had been placed on the arm by Doctor Cayer and pin the fractured elbow area. This was done in the emergency room under local anesthetic a few hours after Doctor Gamburg assumed treatment. The nurse's notes made during the time between admission and Doctor Gamburg's treatment showed that LaDonna's arm was swollen but that circulation remained good. Doctor Gamburg continued to treat LaDonna until she was discharged on February 7, 1976.
Some four years after the accident, on April 14, 1980, and April 22, 1980, LaDonna's mother took her to see Dr. Charles Strange, an orthopedic surgeon practicing in Baton Rouge. Doctor Strange was informed that LaDonna had recently injured her elbow while participating in sports. As the injury was described to Doctor Strange, LaDonna's elbow would "pop" when she fell and placed pressure on the arm. An arthrogram was performed and a small bone spur was found. Doctor Strange stated that the spur probably resulted from the placement of the pin in LaDonna's elbow. Doctor Strange saw LaDonna again on March 5, 1982, and she told him that the "popping" was occurring less frequently.
The plaintiff claims on appeal that the district court erred in failing to apply the doctrine of res ipsa loquitur in order to determine that Doctor Cayer had been negligent in treating LaDonna Paul's injured arm. Since the provisions of La.R.S. 9:2794 dealing with the plaintiff's burden of proof in medical malpractice cases are not applicable where the doctrine of res ipsa loquitur is appropriate, plaintiff argues that the district judge should not have applied the statutory provisions to this case.
The doctrine of res ipsa loquitur is appropriate only if the body of proof establishes or suggests that the alleged negligence of defendant excludes every other reasonable hypothesis as to the cause of the plaintiff's injury such that the negligence of the defendant is the most plausible explanation of the injury. Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir. 1981).
In light of the above, we must disagree with the plaintiff's argument. There has been no showing whatsoever that Doctor Cayer's decision to treat LaDonna Paul's fractured arm through manipulation and casting constituted such negligence that it excluded every other reasonable hypothesis or represented the most plausible explanation for the problems that later developed. The testimony of Dr. Charles Strange in his deposition clearly indicated that there was nothing abnormal or unusual about the treatment rendered by Doctor Cayer and that pain and suffering were natural consequences of an injury such as the one that LaDonna Paul suffered. We cannot say that Doctor Cayer's decision to manipulate and cast the child's arm rather than seek an alternative course of treatment was the most plausible explanation for the difficulties that later emerged under these circumstances. Therefore, the district judge properly chose to apply the provisions of La.R.S. 9:2794 to the case at bar.
Since Doctor Cayer practiced medicine in the specialized area of orthopedic surgery, the plaintiff had the burden of proving that Doctor Cayer either lacked the degree of knowledge or skill ordinarily practiced by other doctors within his own speciality, or that Doctor Cayer failed to use reasonable care and diligence, along with his best judgment in the application of his skills as an orthopedic surgeon. La.R.S. 9:2794; Ardoin v. Hartford Accident & Indemnity Company, 360 So.2d 1331 (La.1978).
Since Doctor Strange was the only expert medical witness in the field of orthopedic surgery during the trial, his testimony was properly regarded by the district judge as dispositive of whether or not Doctor Cayer exercised the skill, care, and judgment usually possessed and exercised by orthopedic surgeons. In this regard, the trial judge correctly determined:
"According to Dr. Strange's deposition, closed reduction with casting is one of the accepted methods for managing a broken bone such as was involved in LaDonna Paul's case. Dr. Strange further related *288 that managing that type of injury involved on going treatment where the important thing is not necessarily initial success but that ultimately the fractured parts of the bone are perfectly aligned with each other thereby preventing deformity. Therefore, Dr. Cayer's manipulation by the closed reduction method, even though it left the bone malaligned, was not in and of itself malpractice. What would have constituted malpractice according to Dr. Strange would have been Dr. Cayer's failure to check in seven to fourteen days whether proper alignment had been achieved or if after discovering a malalignment after seven to fourteen days then not acting to correct it. Since Dr. Gamburg undertook to correct the malalignment of the broken bone in LaDonna Paul's arm only two days after Dr. Cayer's treatment, the limits recognized as reasonable by Dr. Strange for such follow up treatment had not been exceeded. Thus, neither the treatment technique employed by Dr. Cayer or his failure to make a followup examination for two days thereafter violated medical standards for the management of a malaligned fracture."
Furthermore, with regard to the allegation that Doctor Cayer's treatment of LaDonna Paul contributed to the development of circulatory problems in the youngster's injured arm, the district judge correctly commented:
"However, according to Dr. Strange the treatment of other intervening medical problems may have required closer observation and quicker treatment than required by the malalignment of the fracture. For instance, Dr. Strange's deposition makes it clear that guarding against the development of circulatory problems was of top priority in treating a case such as this. Undoubtably, it was with this in mind that Dr. Cayer wrote upon his doctor's orders sheet, "Call me if circulation is embarrassed." If the circulation in LaDonna Paul's arm had become hindered, the inaccessibility of Dr. Cayer may have constituted malpractice. Yet, all the nurse's note sheets reflect that the circulation in LaDonna's casted arm remained good. The last nurse notation was made at 3:00 p.m. on Monday, January 19, 1976. Dr. Gamburg took over treatment of LaDonna Paul only about three hours later. Since Dr. Gamburg did not testify in this case and no other evidence indicates that circulatory problems came about, this Court cannot assume that circulatory complications prompted Dr. Gamburg to operate on LaDonna Paul's arm. Without Dr. Gamburg's testimony or some other evidence this Court could only speculate on why Dr. Gamburg chose to operate on LaDonna Paul almost immediately after first examining her arm. Whether it was circulatory problems, fractured blebs, or just the malaligned fracture cannot be determined. Therefore, the plaintiff has failed to prove by a preponderance of the evidence that intervening medical complications caused LaDonna Paul's injury because Doctor Cayer was inaccessible and failed to make a follow up examination."
We are in agreement with the district judge's assessments, supra. We thereby adhere to his conclusion that Doctor Cayer's treatment of LaDonna Paul's arm did not constitute malpractice under the provisions of La.R.S. 9:2794.
The plaintiff also cites as error the failure of the district court to admit certain testimony of LaDonna Paul and her parents which was entered into the record on three proffers of evidence. In each instance, the testimony sought to be admitted by the plaintiff dealt with Doctor Gamburg's alleged diagnosis of severe circulatory problems in the patient's injured arm. Doctor Gamburg was not called to testify at the trial. The defendants successfully objected each time to the evidence which plaintiff attempted to present on grounds of hearsay. The plaintiff argues, though, that the evidence should have been admitted under recognized exceptions to the hearsay rule.
Plaintiff's first proffer was a statement LaDonna allegedly heard Doctor Gamburg make to her father during a telephone converstation *289 regarding LaDonna's need for surgery. Plaintiff's attorney argued that the testimony was admissible to show the effect of Doctor Gamburg's statement on LaDonna's state of mind in order to establish mental anguish as an element of damages. Plaintiff's second proffer was the testimony of Mrs. Paul, who attempted to repeat what Doctor Gamburg allegedly told her about LaDonna's condition. Plaintiff's attorney argued that the testimony was admissible to show the basis for Mrs. Paul's consent to surgery. Plaintiff's third proffer was the testimony of Mr. Paul that Doctor Gamburg had told him over the telephone that he, Doctor Gamburg, would have to perform surgery on LaDonna as soon as possible. Plaintiff argued that this testimony was particularly reliable since both Mr. Paul and his daughter could testify as to both sides of the conversation and thereby corroborate one another's testimony.
It is well settled in our jurisprudence that evidence is non-hearsay which is offered not to prove the truth of the facts recited, but to prove that the utterance occurred. State v. Drew, 360 So.2d 500 (La.1978); State v. Mitchell, 356 So.2d 974 (La.1978); State v. Sheppard, 350 So.2d 615 (La.1977). Under the proper circumstances, the statements made by LaDonna Paul and her parents could be admissible in order to prove simply that the statements were uttered, or might be allowable under recognized exceptions to the hearsay rule. However, in this case, the relevancy of the testimony was clearly directed toward the truth of Doctor Gamburg's statements rather than to the fact that he uttered them. The testimony, in our opinion, was simply an attempt by the plaintiff to prove that the injured child was having circulatory problems in her fractured arm without having to call Doctor Gamburg to personally testify. Under these circumstances, the testimony was clearly hearsay in nature and was properly excluded by the trial judge.
For the above reasons, the judgment of the trial court is affirmed. All costs are assessed against the plaintiff-appellant.
AFFIRMED.
NOTES
[1] Rapides General Hospital and U.S.F. & G. were subsequently dismissed from the lawsuit on an exception of prematurity which was sustained by the trial judge. They are not parties to this appeal.