FORET, Judge.
This is a medical malpractice suit brought by plaintiff, Charles W. Simar[1] against defendant, Dr. Robert J. Rivet and his professional liability insurer, the Hartford Insurance Group. The alleged malpractice involves the medical care rendered for the treatment of a worker’s compensation claim. Travelers Insurance Company, the worker’s compensation insurer, intervened for worker’s compensation benefits paid to the plaintiff because of alleged extension and compounding of his disability by malpractice of the treating surgeon.
Following trial on the merits, a split[2] jury found that Dr. Rivet was not negligent. The plaintiff has appealed this decision, alleging several specifications of error. The issues before us for review are:
1. Did Dr. Rivet’s conduct fall below the standard of care of neurosurgeons in 1975?
2. Was there a lack of informed consent on the part of the plaintiff?
3. Did the trial court abuse its discretion in failing to grant the motion for a new trial or for judgment notwithstanding the verdict?
4. Did the trial court err in refusing to give a res ipsa charge to the jury?
FACTS
Charles W. Simar was injured in an accident which occurred on December 24,1974. Consequently, he experienced weakness of the arms and legs, and footdrop, rendering walking a painful and difficult experience. Plaintiff continued to work for four or five weeks after this injury until he was referred to Dr. Robert Martinez, a Lafayette area neurologist, on February 4,1975. Dr. Martinez thoroughly examined the plaintiff and found that he had spasticity in the lower extremities, bowel and bladder problems, and cervical injury between the C-5 and C-7 levels. Dr. Martinez confined *198 plaintiff to a hospital for testing and then referred him to defendant, Dr. Robert J. Rivet, for a cervical laminectomy. Plaintiff was scheduled for surgery in February 1975. Unfortunately, a few days after surgery, plaintiff was rendered quadriplegic.
Charles W. Simar suffered from a pre-ex-isting condition as a result of an accident which occurred in 1960. The 1960 accident caused a scarring or cystic enlargement in the spinal cord in the C-6 through C-7 levels. Because the spinal cord was enlarged, special precautions were taken during surgery to prevent flexion and/or extension of plaintiff’s neck. These measures were taken in order to prevent further compression of the spinal cord to avoid compromising the blood supply to the cord with probable quadriplegia.
Plaintiff has complained of the following surgical errors which he alleges constitute malpractice:
1. Selection of improper surgical position.
2. Allowing blood pressure to drop during surgery.
3. Unreasonable flexion of the spine during surgery.
4. Unnecessary handling of the spinal cord.
5. Failure to obtain informed consent.
6. Lack of surgical care.
7. Failure to properly diagnose and handle plaintiff.
8. Failure to provide proper postsurgical care.'
The record reveals that plaintiff was operated on while he was in an upright position — the upright position is now considered to be the most dangerous of three available positions, unless the vertebral column is maintained in a “neutral” position during surgery. According to Yeoman’s Neurosurgical Handbook, 1982 edition, the neutral position maintains a maximum neck flexion of 20°. Plaintiff contends that his head was screwed into the surgical Gardner chair at a 45° angle, which is more than twice the acceptable level of neck flexion. Experts for plaintiff testified that only five or six minutes in such a position would compress the spine and interrupt blood flow with resultant quadriplegia. In addition, he alleges that two dorsal roots which were cut during the surgery, so that Dr. Rivet could reach the dentate ligament, interrupted the blood supply to the cord.
Defendants’ experts testified that the neck was not in flexion according to photographs and x-rays taken during the surgery, and the nerve roots were splayed downward due to scarring and not due to cutting. These experts additionally testified that cutting the nerve roots had no effect on the interruption of the blood supply to the spinal cord since no major blood vessels had been cut.
One of the factual issues at trial was whether or not the cutting of the dorsal roots would interrupt blood supply. Predictably, the answer to this question came down to a battle of the experts. Apparently the jury was persuaded by defendants’ experts as opposed to plaintiff’s. A legal issue was whether or not the cutting of the two dorsal nerve roots breached the standard of care of neurosurgery for practicing neurosurgeons in 1975. According to several of the experts who testified at trial on behalf of defendants, Dr. Rivet was well within the standard of care for neurosurgeons practicing in 1975. Any reasonable inferences made by the jury as a result of testimony and evidence presented at trial should not be disturbed on appellate review. Ewing and Salter, Inc. v. Gafner Automotive & Machine, Inc., 392 So.2d 762 (La.App. 3 Cir.1980), writ ref. 396 So.2d 933 (La. 1981).
MOTION FOR NEW TRIAL
The jury rendered a verdict on December 16,1982, the judgment was signed on January 13, 1983 and amended on February 17, 1983. On December 23, 1982, plaintiff had filed a motion for a new trial and/or a judgment notwithstanding the verdict, based on the grounds that one juror had a conflict of interest which had not been revealed until after trial and that plaintiff *199 had discovered evidence since trial which was unobtainable before or during trial with due diligence. Simar died on February 6, 1983. Hearing on the motion for new trial took place on October 7,1983, and the motion was denied on February 14, 1984. On February 15, 1984, plaintiff filed a second devolutive appeal[3].
Dr. George McCormick, a forensic pathologist, performed an autopsy on March 7, 1983. Evidence taken from the autopsy was introduced on October 7, 1983. The court was of the opinion that the new evidence did not present anything novel on the question of whether or not Dr. Rivet’s surgical procedure fell below the standard of care required of him, and denied the motion.
In order to mandate a new trial, newly discovered evidence must meet all of the tests mentioned in LSA-C.C.P. Art. 1972: the newly discovered evidence is not cumulative, would tend to change the result of the case, and which the party could not have known or could not have discovered before or during the trial with due diligence. It is obvious that the new evidence must create new issues or develop new facts which would suggest a change in the result of the case. Barker v. Rust Engineering Co., 428 So.2d 391 (La.1983); Chauvin v. Chauvin, 297 So.2d 234 (La.App. 3 Cir.1974); Strobel v. Schlegel, 145 So.2d 664 (La.App. 4 Cir.1962), cert. denied Dec. 10, 1962 (unable to find citation).
At the hearing on the motion for new trial, the following evidence was adduced: on behalf of plaintiff, a forensic pathologist testified that the cord was not cancerous and that the only reasonable explanation for cutting the dorsal nerve root bilaterally at two different levels was that the spine had been in a position of extreme flexion. After reading the record at trial and comparing it with the evidence presented at the hearing on the motion for the new trial, we find that the trial judge did not abuse his discretion in refusing to grant a new trial.
Dr. George McCormick testified on behalf of plaintiff. He dissected Simar’s spinal cord and various segments of it were photographed by his technicians. Dr. G. McCormick also reviewed the hospital records, Dr. Liss’ trial testimony, and a neurological surgery textbook. He did not review any other testimony from the trial and indicated in his deposition that he needed more information in order to formulate any opinion. However, Dr. G. McCormick testified at the motion for the new trial and gave an opinion on the case without ever having obtained the information he previously considered necessary. Dr. G. McCormick is not board certified in forensic pathology nor in neuropathology. He has no experience in neurosurgery or neurosurgical procedures. He testified that he did not know whether the dorsal nerve roots or dorsal nerve rootlets had been cut. He further indicated that he did not believe there would be any difference in effect on the blood supply whether dorsal nerve roots and/or dorsal nerve rootlets were cut. He further testified that he did not know whether the silver clips had actually been placed on the roots or rootlets. Additionally, he did not even know what syrin-gomyelia[4] was at the time of his deposition. Based upon the slides and the testimony previously mentioned, Dr. G. McCormick testified that he believed Dr. Rivet *200 had cut the dorsal nerve roots at two levels, that several blood vessels supplying blood to the cord had been cut, and that the cord had been manipulated during the surgery, causing it to become flattened and die and that there was no cancer present anywhere in the spinal cord. Dr. G. McCormick did admit that syringomyelia was present in Simar’s spinal cord prior to the surgery. However, he did not feel that the surgical slides suggested syringomyelia or that a possible tumor was present. Furthermore, he did not know whether or not syringomyelia could be associated with a tumor or neoplasm. He could not tell whether the syringomyelia had progressed from the time of surgery to the time of the autopsy as he made only a static determination.
Also testifying at the hearing on the motion for a new trial was another McCormick, Dr. William McCormick, a professor of neurology, neurosurgery and pathology at the University of Texas, who testified on behalf of defendants. He is board certified in anatomic pathology, forensic pathology and neuropathology, and is the only person in the United States to have these multiple qualifications. Furthermore, he was accepted by the court as an expert in all of the above areas, including that of neurosurgery.
Based upon his review of the testimony, hospital records, and slides taken by Dr. George McCormick, Dr. William McCormick testified that the surgery and biopsy were absolutely necessary. He testified that the slides taken by Dr. Brierre revealed a diseased cord — probably syringo-myelia. He testified that, faced with this particular situation, he agreed with the severing of the dentate ligaments and the dorsal nerve roots. At pages 116-118 of the trial transcript, he stated that:
“It is generally agreed and was almost uniformly agreed in 1975 that in the case of cavitation of the cord, syringomyelia, that if the cord is fixed, the term is tethered, the cord is fixed in this location, that this tethering effect must be eliminated or minimized because with each movement of the body, virtually each pulse of the heart, there is trauma exerted constantly on this fixed, tethered cord. The attempt is made surgically to go in there and cut these dentate ligaments so that ... it will not be fixed over this bony prominence.
* * * * * *
“The question then is, is the risk, the calculation and the risk greater to cut the roots or not to cut the dentate ligaments. Worded another way, is it more important to untether that cord or to run the theoretical risk of causing some embarrassment of blood supply. I think the overwhelming majority of neurosurgeons would believe that the risk was warranted to untether the cord.”
Additionally, Dr. William McCormick testified that the primary blood supply for the motor function neurons was not in any way compromised during the surgery. Dr. W. McCormick magnified the slides taken by plaintiff’s experts by 80 times to determine if any of the major arteries leading to the spinal cord had been compressed during surgery. He was of the opinion that there was no compression during the surgery. Furthermore, Dr. George McCormick’s slides demonstrated only one small vessel was cut when the dorsal nerve roots were cut.
The only relevant issue in this case is whether the autopsy shed any further light on the question of whether the conduct of Dr. Rivet met with the standards required of a neurosurgeon in his diagnosis and treatment of Charles Simar’s condition. The hearing revealed no new evidence on the issue of whether or not Dr. Rivet’s surgical procedure was below the standard of care required of him. As a matter of fact, the evidence revealed that plaintiff had a degenerative disease of the spine. Additionally, pictures taken during surgery by Dr. Brierre reveal a definitely abnormal cord at the time of surgery. Both medical experts agreed that Simar’s condition was serious; that there was a diseased spinal cord with syringomyelia present prior to the surgery; that the surgery was abso *201 lutely necessary; and that a biopsy had to be performed. The overwhelming testimony at trial was to the effect that the cutting of the roots was necessary, and, even more important, it would not and did not cause any interruption in the blood supply to his spinal cord. Consequently, the testimony introduced on behalf of plaintiff at the hearing on the motion for a new trial was merely cumulative and did not indicate a different result being reached in a new trial. The trial court apparently agreed with Dr. William McCormick’s statement that: “There is absolutely no evidence of anything other than the 1975 state of the art neurosurgery.”
In the absence of a peremptory ground for a new trial, the granting of a new trial is discretionary with the trial court. LSA-C.C.P. Art. 1973; Williams v. Cinclare Central Factory, 396 So.2d 301 (La.App. 1 Cir.1981); writ ref., 399 So.2d 621 (La.1981); Conner v. Florida Farm Bureau Casualty Insurance Co., 446 So.2d 383 (La.App. 3 Cir.1984); Hampton v. Rubicon Chemicals, Inc., 458 So.2d 1260 (La.1984); Stelly v. Fidelity & Casualty Company of New York, 434 So.2d 196, (La.App. 3 Cir.1983), reversed, 439 So.2d 1068 (La.1983), reconsideration denied, 441 So.2d 1218 (La.1984). However, a new trial should be granted when there is newly discovered evidence which is not cumulative and which would tend to change the result of a case, and which the party could not know of or could not have discovered before or during the trial with due diligence. LSA-C.C.P. Art. 1972; Barker v. Rust Engineering Co., supra. In such a case, the mover must prove that the new evidence would tend to change the result of the case. Balizar v. Missouri Pacific Railroad, 406 So.2d 324 (La.App. 3 Cir.1981); McGuire v. National Super Markets, Inc., 425 So.2d 1315 (La.App. 1 Cir.1983). In this case, the judge opined that plaintiff had failed to prove that the autopsy results constituted evidence which would tend to change the results of the ease. We find no abuse of his discretion. Consequently, this specification of error has no merit.
DISQUALIFICATION OF A JUROR
Plaintiff alleged another ground for the granting of a new trial: the fact that one of the jurors was a self-employed printer who did a substantial amount of business for defendants’ attorneys’ law firm. Tribune Printing Company does work for almost every law firm in South Louisiana, and there was no bias or prejudice shown on the part of the juror. Clifford J. Gau-bert testified that his employment would have no effect on his ability to listen to the evidence and return a fair and impartial verdict. If a prospective juror is able to declare to the trial court’s reasonable satisfaction that he can render an impartial verdict according to the law and evidence, it is the trial court’s duty to deny the challenge for cause. State v. Claiborne, 397 So.2d 486 (La.1981). The party which challenges a juror on grounds of his relation to a participant in the case must also show that the relationship would influence the juror in arriving at a verdict. State v. McIntyre, 381 So.2d 408 (La.1980), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980). A trial judge is vested with much discretion in ruling on challenges for cause and such rulings will not be disturbed absent a showing of an abuse of that discretion. State v. Benoit, 440 So.2d 129 (La.1983); State v. Edwards, 419 So.2d 881 (La.1982); Broussard v. Missouri Pacific Railroad Co., 376 So.2d 532 (La.App. 3 Cir.1979); State v. Gintz, 438 So.2d 1230 (La.App. 3 Cir.1983); State v. Johnson, 438 So.2d 1221 (La.App. 3 Cir.1983); State v. Winn, 412 So.2d 1337 (La.1982).
ALLEGED MEDICAL MALPRACTICE AND LACK OF INFORMED CONSENT
On February 4, 1975, plaintiff consulted Dr. Martinez because of serious preexisting spinal cord problems. Following evaluation, Dr. Martinez admitted plaintiff to the hospital for x-rays and a myelogram. These were performed by Dr. Paul Sibille. Dr. Sibille found a “near total block at the C-7 level” and a widening of the cord at that level to such an extent that he felt it *202 wise to leave the fluid used for the myelo-gram in it. A mass (cyst) was found on the cord.
Dr. Martinez felt it prudent to refer Si-mar to Dr. Rivet because, left untreated, the plaintiffs condition could progressively worsen and lead to death. Dr. Martinez testified that the only way to determine the extent of the problem and to treat the plaintiffs cord was to perform surgery. Consequently, Martinez contacted Dr. Rivet.
Both Rivet and Martinez agreed that there was a dilation of the spinal cord and that decompression was necessary. Neither doctor was able to determine what the cause of the dilation or compression was. Dr. Martinez discussed the proposed surgery with the plaintiff and his wife and mentioned both paralysis and death as possible results. Dr. Rivet “very vividly and explicitly” explained the possible complications of the surgery. Mrs. Latiolais, Rivet’s nurse, spoke with Simar after he conferred with Dr. Rivet because she wanted to be sure that the patient understood what the doctor had told him.
Plaintiff, his wife, and his daughter, Donna Wright, testified that they were not informed of all of the ramifications of the proposed surgery. However, the record reflects that Dr. Rivet customarily discussed the potential outcome and problems with each patient. Mrs. Latiolais and Dr. Martinez both testified that they had also spoken to the Simars about the surgery. Consequently, we find support in the record indicating that Dr. Rivet had the informed consent of Charles Simar.
Dr. Robert Rivet had been a practicing neurosurgeon in the Lafayette area for seventeen years and is a board certified neurosurgeon. After having previously reviewed the myelogram and x-rays taken and discussing them with Drs. Martinez and Sibille, Rivet spoke with Simar and his wife at Lady of Lourdes Hospital. Rivet testified that between the three doctors a tentative diagnosis of tumor, syrinx (cyst) and/or some type of arthritic change was considered the cause of the narrowing of the spinal canal at the C-6, 7 levels. In addition, Rivet testified that Simar had a flexion deformity at the C-6, 7 levels, which he attributed to a traumatic fusion, probably the result of plaintiff's 1960 accident.
Dr. Rivet testified that a decompression of the cord was necessary, but a laminecto-my would be performed first, to get to the cord itself. Because of plaintiff’s condition, Rivet was of the opinion that the laminectomy should be performed posteri-orly. If the syrinx (cyst) were found, it could be aspirated; if a tumor were found, a biopsy performed.
On February 10, 1975, Dr. Rivet again saw Simar immediately prior to surgery. Dr. Brierre, the pathologist, and Dr. Russell Theard, the anesthesiologist, were present during the surgical procedure. Dr. Theard was responsible for maintaining an adequate blood supply to the various parts of the plaintiff’s body and monitoring the blood pressure. Dr. Brierre photographed the spinal cord and was of the opinion that a tumor or syringomyelia was present.
Plaintiff was placed in a Gardner chair for surgery. An incision was made from the back to the neck and the musculature protecting the spine from the back was removed laterally. Dr. Rivet proceeded to remove the vertebra extending from C-4 to T-l with a right angle rib cutter. A Lek-sell double action rongeur was used to thin down the lamina so that it could eventually be removed, thus enabling him to get to the diseased area of the spine. To perform the actual laminectomy, a Smith Kerrison rong-eur was used. The lining over the spinal cord, the dura, was opened up below the abdominal area. Using a number 11 blade, Dr. Rivet continued to open this area. Stitches were placed on the dura to hold it away from the diseased cord. Believing a syrinx (cyst) was present, Dr. Rivet inserted a 20 gauge needle into the median raphe in order to aspirate the cyst. He was unable to do so. Noticing a cystic dilation on the surface of the cord, Dr. Rivet made an incision in the cyst. Fluid was released and the cyst appeared to be traumatic; *203 therefore Dr. Rivet biopsied the cyst using small alligator forceps. After discussing the possibilities with Dr. Martinez, it was decided that the biopsy would be analyzed by Dr. Brierre. Dr. Brierre opined that Simar might have a cystic astrocytoma, grade one, which is a low-grade malignant neoplasm or tumor. Permanent slides were made at the time because no final diagnosis had been arrived at. The slides were later reviewed by Dr. Kepes, pathologist, and Dr. Earl, the leading neuropathol-ogist in the world and the editor of numerous texts on neuropathology. Dr. Kepes diagnosed the cyst as a non-cancerous condition and Dr. Earl corroborated the previous findings of Drs. Brierre, Rivet and Martinez.
During the surgery, Dr. Rivet concluded that there was pressure underneath the spinal column as well as within the cord. Consequently, he cut the dentate ligaments, the ligaments which anchor the spinal cord down to the ventral surface. He believed that by cutting the dentate ligaments, he would prevent the spinal column from being pulled down on the bony prominence which was present as a result of the 1960 injury. Because of the tremendous scarring in that area due to the 1960 injury, Dr. Rivet first cut the dorsal roots in order to reach the dentate ligaments without manipulating the spinal cord. (Dr. Rivet first testified that he cut the dorsal roots at two levels on each side and later retracted that statement, realizing he was mistaken and had actually cut the dorsal roots on only one level. However, after the autopsy performed on Simar, it was obvious that Rivet had cut the dorsal roots at two levels on each side.)
After cutting these dorsal roots, Dr. Rivet placed tubing into the cystic cavity so that the cyst would not reform. Rather than placing the dura back as it had been originally, Dr. Rivet placed a dura patch graft on the back to avoid any possible pressure on the cord. The musculature, subcutaneous tissue and skin were placed in their normal positions and sutured. Si-mar was then taken out of the Gardner chair and sent to recovery. His vital signs were monitored continuously until he was returned to his room, where those duties were assumed by the floor nurses. Simar was able to move all extremities in response to commands the evening of his surgery. On February 11, 1975, when Dr. Rivet went to check on Simar, Simar told him that he could not move his legs. Consequently, Dr. Rivet administered steroids in an attempt to alleviate any possible swelling. He also ordered a second myelo-gram because of his fear that a blood clot might be putting pressure on the spinal cord. No clot was found.
Simar was hospitalized from February 10, 1975, until March 21, 1975. Following his discharge from the hospital, Simar’s condition deteriorated to a point that he' ultimately lost all feeling in his lower body, becoming quadriplegic.
Plaintiff contends that the jury committed manifest error in failing to find the conduct of Dr. Rivet below the standard of care of neurosurgeons practicing in Lafayette, Louisiana, in 1975.
Dr. Rivet is a neurosurgeon, a medical specialist. The duty owed by a medical specialist is governed by the professional standards of the medical specialty and not by the professional standard within a locality or community. In Hankel v. Hartford Fire Insurance Co., 366 So.2d 1031 (La.App. 1 Cir.1978), writ refused, 368 So.2d 124 (La.1979), the court cited Ardoin v. Hartford Accident & Indemnity Company, 360 So.2d 1331 (La.1978), and stated that: “a medical specialist is required by La. Civil Code Articles 2315 and 2316, and La.R.S. 9:2794, to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty.”
Plaintiff presented medical expert, Dr. David Chesire, formerly of London, England, and of late from Arizona, as an expert in the field of diagnosis, care and rehabilitation of diseases and injuries of the spine and spinal disorders, but he was rejected by the court as an expert in the field of the technique of surgery to the *204 spine. Dr. Chesire testified that he last performed neurosurgery as chief surgeon in 1959. His only surgical participation thereafter was of a scrub surgical assistant. Dr. Chesire is not a board certified neurosurgeon — nor is he even board qualified. He has no surgical privileges in the United States and has never taught surgical procedure or technique. Dr. Henry Liss, the other expert on behalf of plaintiff, was accepted by the court as a neurosurgeon. He is a practicing neurosurgeon in Chatham, New Jersey.
On behalf of defendants, the following experts testified: Dr. Robert Martinez, neurologist; Dr. Ted Brierre, pathologist; Dr. Paul Sibille, radiologist; Dr. Russell Theard, anesthesiologist; Dr. John Jackson, neurosurgeon; and Dr. Robert Gross-man, neurosurgeon. All of these experts were accepted in the fields in which they were tendered. After weighing the testimony of the plaintiffs experts and the defendants’ experts, the jury found for the defendants. In Cadiere v. West Gibson Products Company, Inc., 364 So.2d 998 (La.1978), the court held:
“The reviewing court must give great weight to the factual conclusions arrived at by the trier of fact, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own evaluations and inferences are as reasonable. Aleman v. Lionel F. Favret Co., Inc., 349 So.2d 262 (La.1977); Canter v. Koehring Co., 283 So.2d 716 (La.1973). ‘The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.’ Canter v. Koehring Co., supra at 724.”
The jury apparently believed the evidence supported the conclusion that Dr. Rivet had performed the laminectomy in a manner in keeping with the standard of care, skill, and procedure generally followed by neurosurgeons in 1975. This case presents us with a classic example of a “battle of the experts.” However, when the trier of fact is a jury, evaluation of the credibility and weight of testimony must be made by that body. Theriot v. St. Martin Parish School Board, 434 So.2d 668 (La.App. 3 Cir.1983). In the evaluation of credibility, when faced with conflicting testimony, the fact finder must be given a great deal of discretion. These evaluations may not be reversed by an appellate court in the absence of manifest error. Miller v. Fogleman Truck Lines, Inc., 398 So.2d 634 (La.App. 3 Cir.1981), writ denied, 401 So.2d 358 (La.1981); Reed v. Henry, 343 So.2d 457 (La.App. 3 Cir.1977).
RES IPSA LOQUITUR
Plaintiff contends that the trial court erred in failing to give the jury a special res ipsa loquitur charge. The doctrine of res ipsa is appropriate only if the proof establishes or suggests that the alleged negligence of the defendant excludes every other reasonable hypothesis as to the cause of plaintiff’s injury, such that the negligence of the defendant is the most plausible explanation of the injury. Paul v. St. Paul Fire & Marine Ins. Co., 430 So.2d 285 (La.App. 3 Cir.1983). The res ipsa doctrine is appropriately applied only when the accident is of a kind that does not ordinarily occur in the absence of negligence; the injury was caused by an agency or instrumentality within the control of the defendant; and the evidence as to the cause of the accident is more readily available to the defendant. Ray v. Ameri-Care Hospital, 400 So.2d 1127 (La.App. 1 Cir.1981), writ denied, 404 So.2d 277 (La.1981). Only when there is an indication that the defendant’s negligence is the most probable explanation or the most probable cause of the injury should the rule of res ipsa be applied. Boudreaux v. American Insurance Co., 264 So.2d 621 (La.1972).
Simar experienced paralysis on two prior occasions, in 1960 and in 1974. Additionally, all of the medical experts in this *205 case agreed that Simar’s condition would worsen without surgery. In fact, without surgery, a good probability existed that he would have been completely paralyzed in the future. All medical experts agreed that the biopsy of the cystic area of the spinal cord was absolutely necessary. The medical evidence presented clearly establishes that the most probable cause of the paralysis was not attributable to any act of negligence on the part of Dr. Rivet.
Consequently, the trial court did not err in failing to give a charge of res ipsa loquitur because it cannot be said that any act of negligence on the part of Dr. Rivet was the most plausible or probable cause of Simar’s resulting quadriplegia.
For the above mentioned reasons, the judgment of the jury and the ruling of the trial court are hereby affirmed.
All costs of this appeal are assessed against plaintiffs-appellants.
AFFIRMED.

. Plaintiff died February 6, 1983. His widow and child are substituted as plaintiffs and are referred to herein as "plaintiff”.

. The jury was split only over the informed consent issue. On the medical testimony the jury was unanimous.

. On March 22, 1983, plaintiff filed an alternative motion to appeal the original judgment. However, the trial judge never signed an order in the matter and therefore, he retained jurisdiction to hear the motion for a new trial.

. "syringomyelia (si-ring’go-mi-e’li-ah) [syringo- + G. myelos, marrow]. Hydrosyringomyelia; Morvan’s disease; myelosyringosis; syringo-myelus; the presence in the spinal cord of longitudinal cavities lined by dense, gliogenous tissue, and not caused by vascular insufficiency; it is marked clinically by pain and paresthesia followed by muscular atrophy of the hands; there is analgesia with thermoanesthesia of the hands and arms, but the tactile sense is preserved. Later, painless whitlows are seen, spastic paralysis appears in the lower extremities, and scoliosis of the lumbar spine occurs. Some cases are associated with low grade astrocyto-mas or vascular malformations of the spinal cord.”
Stedman’s Medical Dictionary, 5th Lawyers’ Edition (1982), page 1400.