NORRIS, Judge.
This is a suit alleging medical malpractice in the treatment of a broken wrist. The plaintiff, Dalton Stephens, took his claim to a medical review panel, pursuant to LSA-R.S. 40:1299.41 et seq. The panel ruled that the defendant, Dr. DeLoach, did not fail to meet the standard of care of a general surgeon and that his conduct was not a factor in the asserted resultant damages. Stephens proceeded with his case to a jury trial; his workers compensation carrier intervened. In reaching a verdict for the defendant, the jury found in response to special interrogatories that Dr. DeLoach did not fail to meet the standard of care of a general surgeon. Mr. Stephens now appeals, urging the jury committed manifest error in failing to find that three specific areas of defendant’s conduct were malpractice:
(1) Casting the plaintiff’s wrist in maximum flexion, thereby putting pressure on the median nerve and killing it;
(2) Failure to order nerve tests and finger exercises;
*1374 (3) Failure to refer plaintiff to an orthopedist timely.
Dr. DeLoach argues not only that his conduct was not substandard but that it was not a proximate cause of the injuries sustained. For the reasons expressed, we affirm.
FACTS
While in the course and scope of his employment for Dunham Manufacturing in Minden, Mr. Stephens fell five or six feet off a ladder onto a concrete floor. He landed on his right hand and suffered immediate pain. The accident occurred on Tuesday, April 17,1984. Mr. Stephens was promptly carried to Minden Hospital where Dr. DeLoach, a general surgeon, was Chief of Staff.
According to Mr. Stephens, Dr. DeLoach examined the hand and did not say how bad it was, but said he could “fix it.” Mr. Stephens testified that Dr. DeLoach “pulled and stretched” the hand as far as it could go and then placed it in a cast so tight he could not move his fingers. Dr. DeLoach testified that Mr. Stephens had sustained a serious multiple fracture of the distal radius; he performed a closed reduction by manipulating the fragments. The better to hold the reduction in place, he flexed the wrist and set it in a long-arm cast that extended from above the elbows to the knuckles. Dr. DeLoach admitted that while he was manipulating Mr. Stephens’s wrist the nurse was holding it in a 90° position, but that he ultimately set it in a much lower degree of flexion and “ulnar deviation.” Dr. DeLoach testified it was not good to set a wrist in maximum flexion, so he did not so set Mr. Stephens’s, but Mr. Stephens testified that his wrist was painfully bent as far as it would go.
As to the exact angulation of the wrist, Dr. DeLoach estimated he had set the cast at a 30° angle. The medical experts viewed X-rays of the hand in the cast and made rough estimates. Dr. Rambach, an orthopedist who served on the medical review panel and testified for the defendant at trial, testified the wrist was bent about 30°-40°; in deposition, he had said 70°, but he explained at trial that the radial lunate joint was only 30°. He testified that the X-ray showed flexion close to the maximum, but he added he had seen some good results with maximum flexion in this type of fracture. Dr. Bundrick, another orthopedist who served on the medical review panel and testified for the defendant at trial, said that only the fingers were flexed greatly, perhaps at 60° or 70°, whereas the wrist joint itself was “more neutral.” Both Dr. Bundrick and Dr. Rambach thought the X-rays were too oblique to show the true flexion. Dr. Snell, a retired, medical school professor and orthopedist from California, who testified by deposition for the plaintiff, said the wrist was flexed at 75°-80°. He stated that the critical X-ray was a “well defined lateral projection.” Dr. Brian, an orthopedist who later treated Mr. Stephens, testified that a subsequent cast that was fitted by Dr. DeLoach and flexed the wrist to only about 40° was in “marked flexion.” The danger of flexing the wrist tightly is that this might close the carpal tunnel and impinge on the median nerve.
Mr. Stephens remained in the hospital for four days, during which he complained of problems with the cast. It was too tight and he could not move his fingers; he experienced burning sensations in the wrist and tingling in the fingers. The hospital records verify this, adding that the hand was elevated on a pillow for relief and checked frequently for finger motion. They also indicate that he received pain medication, and on the date of discharge, April 20, there was “no complaint at present.” Dr. DeLoach’s discharge summary acknowledges “burning” and “some tingling,” but finds good circulation in the fingers and states, “can move all fingers.” R.p.p. 289, 290. Dr. DeLoach put the arm in a sling and instructed Mr. Stephens to use the sling, elevate the hand and to keep his fingers moving. Mr. Stephens testified that Dr. DeLoach did not give these instructions. Dr. Brian testified that finger exercises should be ordered “as soon as possible” in cases of this sort.
Mr. Stephens was discharged from the hospital on a Friday and Dr. DeLoach *1375 scheduled an office visit for the following Tuesday, April 24. Mr. Stephens returned on that day, still complaining that the cast was too tight and that his hand was in such pain that he had to take Tylenol 2. Dr. DeLoach thought he appeared “uncomfortable” so he removed the cast and X-rayed the wrist; there were some fracture blisters which had to be drained and cleaned. Dr. DeLoach then fitted him with a new, shorter fiberglass cast. The X-ray showed that the closed reduction had been “lost,” so Dr. DeLoach decided that Mr. Stephens should see an orthopedist. Dr. Brian, who testified both as a fact and expert witness, is domiciled in Bossier City but apparently drove to a satellite office in Minden about once a week. Mr. Stephens saw Dr. Brian the next time he was to be in town, but this was not until the following Monday, April 30, or six days later.
When Dr. Brian saw Mr. Stephens, he immediately concluded that an open reduction would be required; the fracture was displaced and neural involvement was indicated. He could not operate, however, because there was still a blister, which created a great risk of infection. He testified that blisters are a consequence of severe fractures. He placed Mr. Stephens on antibiotics and was able to operate on May 5. He found that healing had already begun and the bones were hard to move. He located Mr. Stephens’s median nerve: it was bruised, discolored and perhaps had bled. He testified that a small, bony spicule had jutted into the carpal tunnel and affected the nerve. Because of the nerve damage, he estimated Mr. Stephens would have a residual 60% disability of his right arm and hand. Dr. Brian testified that trauma from the fall, together with the inpingement from the broken bone, caused the disability. Dr. Bundrick and Dr. Ram-bach agreed that the trauma and the spicule were responsible for the disability; only Dr. Snell thought that Dr. DeLoach's act of setting the wrist at such a severe angle was a significant factor, although he did not completely exclude the influence of the trauma.
As noted, Mr. Stephens submitted a claim to a medical review panel. The expert panelists included Drs. Rambach and Bundrick, who testified at trial, and Dr. Bicknell, who did not. The panel found unanimously that the evidence did not support the conclusion that Dr. DeLoach failed to meet the applicable standard of care and that his conduct was not a factor of the asserted resultant damages. At trial, the jury likewise found Dr. DeLoach did not fail to meet the standard of care of a general surgeon. Judgment was accordingly rendered and signed for the defendant.
DISCUSSION
On appeal Mr. Stephens claims the jury’s verdict was manifestly erroneous. He argues exclusively that with respect to the standard of care, the evidence as a whole makes the jury’s finding on this issue clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, the judgment before us is one that rejects the plaintiff’s demands and not one that simply makes a finding as to the standard of care. Appeal is from the judgment, not the reasons therefor. Caldwell v. Second JDC Indigent Defender Bd., 475 So.2d 96 (La.App.2d Cir.1985), writ denied 477 So.2d 1126 (La.1985); Cason v. Oglesby, 188 So. 2d 718 (La.App.2d Cir.1966), writ denied 249 La. 842, 191 So.2d 642 (1966); Bd. of Com’rs of Orleans Levee Dist. v. Shushan, 197 La. 598, 2 So.2d 35 (1941). We have therefore reviewed the evidence most favorably toward supporting the judgment. Jenkins v. St. Paul Fire & Marine Ins., 422 So.2d 1109 (La.1982); Wilson v. Wal-Mart Stores, 448 So.2d 829 (La.App.2d Cir.1984).
The plaintiff in this medical malpractice action must meet a twofold burden of proof. He must first prove that the defendant lacked the degree of skill ordinarily possessed by a general surgeon in the area or that he failed to use reasonable care and diligence along with his best judgment in the application of that skill. He must next prove that as a proximate result of this lack of skill or failure to exercise reasonable care, the plaintiff suffered injury that would not otherwise have been in *1376 curred. LSA-R.S. 9:2794; Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978). Thus despite plaintiff counsel’s very diligent efforts to show that the conclusion as to standard of care is plainly wrong (and we concede this is a close question), we must also examine whether the record evidence would render manifestly erroneous the implicit conclusion that the plaintiffs injuries were not the proximate result of Dr. DeLoach’s conduct.[1] On this latter issue the evidence is not close and we are constrained to affirm the judgment of the trial court. We will nevertheless briefly discuss the evidence pertaining to the standard of care since plaintiff counsel has argued it so capably.
STANDARD OF CARE
As noted above, the plaintiff cited three specific acts which are alleged to be breaches of the standard of care. The initial problem with this argument is that none of the experts ever testified in a comprehensive way as to what duty a general surgeon owed to a patient who came in with a severely comminuted fracture of the distal radius. The plaintiff bears the burden of proving the applicable standard of care. White v. McCool, 395 So.2d 774 (La.1981); Paul v. St. Paul Fire & Marine Ins., 430 So.2d 285 (La.App. 3d Cir.1983).
Nevertheless the experts made random statements about how they would treat a fracture such as this. All agreed that the fracture should be treated as soon as possible. Dr. Snell, whose deposition was rather comprehensive, stated that he would apply anesthesia, then traction and manipulation; he would set the wrist in a plaster cast until the fracture was united. The other doctors agreed that this method of “closed reduction” was always the first choice. Dr. DeLoach could not have performed an open reduction at the time because Mr. Stephens had also sustained a slight head injury and there was the danger of a concussion, with which general anesthesia is inadvisable. Dr. Snell further stated he would immobilize the wrist in a neutral position because flexing the wrist placed pressure on the median nerve and preserving this nerve was a paramount consideration. Dr. Brian likewise testified that nerve damage would be his first concern. Drs. Bundrick and Rambach, however, testified they would flex the wrist inward in order to hold the fracture in place; a patient injured as severely as Mr. Stephens needed to be treated first for the fracture and the nerve was a secondary consideration at the time. Drs. Bundrick and Rambach intimated that maximum flexion was not generally advisable, but cautioned that under the right circumstances it was proper. As noted earlier, the experts’ estimates of the true angle of flex-ion in Mr. Stephens’s first cast were somewhat varied.
The evidence shows that Dr. DeLoach properly attempted a closed reduction by manipulation and immobilization in a plaster cast. Despite the experts’ inability to estimate the degree of flexion, our own viewing of the X-rays, especially Ex. P-4-X4, indicates a fairly severe angulation, which the doctors as a whole seemed uncomfortable with. This would suggest a breach of duty. We find the evidence so close that we might have been inclined to reach the opposite conclusion from the jury’s had we viewed it as a factfinding body. However, we have pretermitted a resolution of this difficult issue because of the outcome of the causation question.
While in the hospital, Mr. Stephens lodged consistent complaints of pain, tingling, burning and swelling in his hand and fingers. According to Dr. Brian, these symptoms would indicate nerve damage, for which he would have split or bi-valved the cast. Dr. Snell agreed, adding that his review of the hospital records showed no evidence that a nerve test was conducted. He suggested a simple test of pricking the fingertips with a pin to gauge sensation. Dr. Brian further testified that he would have recommended finger exercises to keep the nerve active. Mr. Stephens testified that Dr. DeLoach never recommended *1377 nerve tests or finger exercises, despite his symptoms.
Dr. DeLoach testified, however, that he did numerous things to relieve the inevitable pain associated with such a severe injury, including the administration of strong analgesics and instructions to keep the fingers elevated and in motion. The hospital records show that Mr. Stephens’s finger mobility was being constantly monitored, and this suggests that he was asked to move his fingers fairly often. There is no evidence that Dr. DeLoach performed the nerve test mentioned by Dr. Snell.
Given this state of the evidence, we admit that a factfinder might reasonably have concluded that these precautions were warranted and that Dr. DeLoach failed to take them. However, it is possible that Dr. DeLoach attributed the symptoms to the seriousness of the fracture and its attendant pain and swelling. This issue is very close, and we pretermit a resolution of it.
Plaintiff contends that despite the roundly acknowledged duty to treat fractures quickly, and the symptoms suggestive of neural involvement, Dr. DeLoach waited six days between discovering that the closed reduction had failed and sending him to the orthopedist. Plaintiff equates this with the failure to diagnose and refer to a specialist that was found to be substandard conduct in Fairchild v. Brian, 354 So.2d 675 (La.App. 1st Cir.1978). In the instant case, Dr. DeLoach suspected a problem on April 24 but for some unexplained reason Mr. Stephens did not see Dr. Brian until April 30.
The record offers no insight into the reasons for this delay. Dr. DeLoach denied that there was an arrangement for referrals between himself and Dr. Brian, which might arguably have induced Dr. DeLoach to use Dr. Brian only. Dr. Brian also denied this. Mrs. Stephens testified there was no reason she could not have carried Mr. Stephens to Bossier City on April 24. However, given Dr. Brian’s unwillingness to operate on a blistered hand, it is possible that he, and not Dr. DeLoach, suggested the delay in order to let the blisters dry. Dr. DeLoach may also have favored the delay for this reason, feeling that fitting the plaintiff with a looser and less flexed cast would alleviate the blistering until Dr. Brian could perform an open reduction. While we feel almost intuitively that a six day delay under these circumstances is not good medical practice, the evidence does not plainly show that Dr. DeLoach was responsible for it. The evidence on this particular claim is therefore inconclusive.
CAUSATION
The second issue, and the one dis-positive of the case, is causation. The plaintiff must prove that he suffered injury as a proximate result of the doctor’s lack of skill. R.S. 9:2794. All the experts provided explicit testimony about causation. All but Dr. Snell unequivocally concluded that the injury was a result of the initial impact when Mr. Stephens fell on his hand.
Dr. Brian, who garnered the best information when he performed the open reduction, stressed the severity of Mr. Stephens’s fracture. He thought the force of the fall must have been great to cause the bone to shatter and the pieces to spread the way they had. He found about xk to % inches of the median nerve, which is usually yellow-white, glistening and gleaming, to be bruised, discolored and reddish-purple. This indicated to Dr. Brian that there had been trauma and bleeding within the nerve itself. He stated that this nerve injury was consistent with the fall that had occurred. R.p. 130. He found a bony spike projecting under the nerve and pulling the nerve across it; he concluded the spike had caused the nerve damage and had jutted into the carpal tunnel when Mr. Stephens fell. This, together with the fall and the trauma of hitting the heel of the hand on a concrete floor, was responsible for the impairment; Dr. DeLoach’s acts were not.
Dr. Bundrick, having examined Dr. Brian’s surgical notes, agreed with this conclusion. He testified that the median nerve passes directly through the fracture area, where the bone was broken in several places. He concluded that the nerve was impaled on a bone spike at the time of the injury and that Dr. DeLoach’s subsequent treatment was not a factor.
*1378 Dr. Rambach, also referring to Dr. Brian’s notes, testified strongly that the initial impact and breaking of bone caused the entire injury. He further testified that the nerve injury described could cause the kind of impairment that Mr. Stephens now suffers.
Dr. Snell expressed a different opinion. He felt that positioning the hand in a rigid cast at maximum flexion would surely render the nerve functionless after a week’s time. He stated that Mr. Stephens’s injury was not excessively severe, with only three or four fragments, so the positioning caused the injury to a reasonable degree of medical certainty.
Viewing this testimony as a whole, we cannot conclude that the implicit finding of no causation is plainly wrong. There is ample evidence to support a finding that Dr. DeLoach’s conduct did not result in any more injury than was already sustained. In an effort to reconcile Dr. Snell’s deposition with the unequivocal opinion of the other experts, we have noted his comment that if the nerve had been permanently injured at the moment of impact, then the positioning of the wrist would be irrelevant because the injury was already sustained. Snell’s Dep., 37. Dr. Snell also conceded that the nerve impingement from a bony spike at the time of the accident was possible but not probable. Finally, he reluctantly admitted that Mr. Stephens's residual impairment was a “combination of both” the accident and the treatment. Snell’s Dep., 32.
When Dr. Brian testified to the usual effects of a wrist fracture, he sounded somewhat like Dr. Snell. Citing a medical treatise, he stated that nerve damage due to bony spicules was extremely rare, occurring in only 1-3% of all fractures. R.p. 154. Yet he testified that when he opened Mr. Stephens’s wrist, he found a spike actually jutting into the tunnel and stretching the nerve. We think this clinical finding brings the instant case into the very small realm of neural injury recognized by both Dr. Brian and Dr. Snell. With Dr. Brian’s recital of the facts, the conclusion is reasonable and more probable than not that the force of the fall and the resultant bony spike impinging the carpal tunnel at the time of the fall caused the injury, and not Dr. DeLoach’s later treatment.
Dr. Snell admitted his assumption that no trauma affected the nerve when Mr. Stephens fell. Snell’s Dep., 37. He stated that a healthy nerve would be impaired by being set in maximum flexion for a week, but that only a fracture would cause a bony spike to impinge. Dr. Brian’s testimony, however, supplied the assumption with the clinical opinion that the bruised nerve had sustained significant injury at the time of the fall; with this premise satisfied, Dr. Snell’s position is not so ¡incompatible with that of the other experts. He simply did not find an injury where the treating physician did. His reluctance to ascribe the impairment to the fall might be traced to his misapprehension of the severity of the initial injury, which seems clear to us through not only Dr. Brian’s and Dr. DeLoach’s factual testimony and Mr. Stephens’s own description of the exquisite pain he suffered at the outset, but also through the expert opinions of the other physicians. This underscores the implicit conclusion that the fall and the broken bones caused the nerve damage and that Dr. DeLoach’s treatment, though arguably substandard, did not further contribute to the impairment. The evidence will not sustain an argument that this is manifestly erroneous. Without sufficient proof that Dr. DeLoach’s conduct caused the injury, we are constrained to hold that Mr. Stephens’s claim was properly denied.
CONCLUSION
For the reasons expressed, the judgment is affirmed at plaintiff's costs.
AFFIRMED.
ON APPLICATION FOR REHEARING
Before SEXTON, NORRIS, MARVIN, HALL and JASPER E. JONES, JJ.
Rehearing denied.

. We would note that plaintiffs brief deals exclusively with the issue of standard of care, whereas defendant’s brief is mostly weighted toward the issue of causation.