488 So.2d 412 (1986)
Troy F. TOUCHET, Plaintiff-Appellant,
v.
Mrs. Maudry M. CHAMPAGNE, Randall G. Champagne and State Farm Mutual Automobile Insurance Co., Defendants-Appellees.
No. 85-593.
Court of Appeal of Louisiana, Third Circuit.
May 14, 1986.
Domengeaux and Wright, Charles W. Dittmern, New Orleans, for plaintiff-appellant-appellee.
Shelton and Legendre, Aubrey E. Denton, Jackson Bolinger, Matthew J. Hill, Jr., George J. Forest, Hannah and Kaufman, David Kaufman, Lafayette, Ambrose Johnson, Carencro, for defendants-appellees.
McBride and Foret, Norman P. Foret, Domengeaux and Wright, Robert K. Tracy, Lafayette, for defendant-appellant.
*413 Before GUIDRY, PICKETT and TUCK,[1] JJ.
GUIDRY, Judge.
In this suit Troy Touchet seeks damages for personal injuries sustained by him as a result of an intersectional collision between a pick-up truck owned by Randall Champagne but driven by Mrs. Maudry Champagne (sometimes referred to as Marjorie Champagne) and a car driven by Troy Touchet. Mrs. Champagne was the sole occupant of the pick-up truck. There were three guest passengers in the Touchet vehicle, Glenn Touchet, Ambrose Johnson and Howard Edmond. Glenn Touchet and Howard Edmond died as a result of injuries sustained in the accident. The other occupants of the two vehicles sustained bodily injuries.
Five separate suits were filed as a result of this accident.
The first suit was one filed by Harold Champagne and his wife, Marjorie, against Troy Touchet, Estate of Howard Edmond, Ambrose Johnson, Mr. and Mrs. Harold Touchet, Estate of Glenn Touchet and State Farm Mutual Automobile Insurance Company (hereafter State Farm), the Champagne's uninsured motorist carrier.
The second suit was one filed by Firemen's Insurance Company of Newark, New Jersey, the uninsured motorist carrier of Mr. and Mrs. Harold Touchet against Troy Touchet, Maudry Champagne and State Farm seeking recovery for the sum of $25,000.00 paid to their insureds for damages for the death of their son, Glenn Touchet. State Farm and Maudry Champagne filed a third party demand in this suit against Troy Touchet.
The third suit was one filed by Troy Touchet against Maudry Champagne, Randall Champagne and State Farm.
The fourth suit was one filed by Mr. and Mrs. Harold Touchet against Randall Champagne, Maudry Champagne, Troy Touchet and State Farm. The Champagnes and State Farm filed a third party demand in this suit against Troy Touchet.
The fifth suit was one filed by Joyce Girouard, as administratrix of the estate of her minor child, Felicia Marie Girouard, against Troy Touchet, Randall Champagne, Maudry Champagne, State Farm and XYZ Insurance Company, the alleged liability insurer of Troy Touchet.[2] The Champagnes and State Farm filed a third party demand in this suit against Troy Touchet.
The several suits above mentioned were consolidated for trial on the merits. During trial, the suits referred to hereinabove as the first suit and the second suit were dismissed with prejudice on motion of plaintiffs. Also during trial, the plaintiffs in the remaining three suits released all named defendants except State Farm. Thus, when the matter was submitted to the jury the only viable issues were the liability of State Farm, as insurer of the Champagnes, and the third party demands of State Farm against Troy Touchet. The jury unanimously determined that Mrs. Maudry Champagne was not negligent and judgments were rendered pursuant to the jury verdict dismissing plaintiffs' demands in the remaining three suits. Plaintiffs in the three remaining suits appealed. The matters remain consolidated on appeal. The appeal in the suit referred to above as the third suit bears our docket number 85-593; the appeal in the suit referred to above as the fourth suit bears our docket number 85-594; and, the appeal in the suit referred to above as the fifth suit bears our docket number 85-595. We will decide all issues presented in the three cases in this opinion but render separate decrees in the companion matters.

ISSUES
Appellants present two issues for our review:

*414 1. Whether the jury committed manifest error in failing to find that Mrs. Maudry M. Champagne was negligent.
2. The quantum of damages which Troy Touchet, Mr. and Mrs. Harold Touchet and Felicia Marie Girouard are entitled to recover.
Since we conclude that the jury finding pertaining to the negligence of Mrs. Maudry M. Champagne was not clearly erroneous, we need only discuss the first issue.

FACTS
The accident took place at the intersection of Moss and Willow streets in Lafayette, Louisiana. Moss Street is a four lane road that runs in a north-south direction. Willow Street, at the intersection, is a five lane east-west road, the additional lane is used for left turns onto Moss Street. The intersection is well lighted at night.
At approximately 9:00 p.m., the traffic lights, which control the traffic on these two roads, begin to flash yellow for traffic proceeding on Moss Street and red for traffic on Willow Street.
On the northeast corner of the intersection there is a building used as a laundromat which sets back about 20 yards from Moss Street. The 20 yards between the laundromat and Moss Street is used for an open, ground level parking lot. This building partially obstructs the view of motorists driving south on Moss Street and motorists driving west on Willow Street.
On the night of March 11, 1982, Mrs. Maudry M. Champagne left her residence in her son's Chevrolet pick-up truck at approximately 10:25 p.m. or 10:30 p.m. in order to drive to her place of employment at the post office located near Moss and Willow streets. The drive from her home to the post office was about six or seven miles. She traveled in a southerly direction on the inside lane of Moss Street.
Mrs. Champagne testified that the posted speed limit on Moss Street was 45 mph. The investigating police officer thought the posted speed limit was 40 mph. At any rate, Mrs. Champagne was traveling from 35-40 mph, within the posted speed limit. While she was one-half block away from the intersection, she released all foot pressure from the gas pedal and, at the same time, looked to her left, towards the corner of Moss and Willow where the laundry was located, to search for traffic. Her estimated speed reduced to approximately 30 mph as she traveled closer to the intersection. She continued to keep her foot pressure off of the gas pedal, although her foot was lightly resting on the pedal. She did not see any traffic approaching or stopped on Willow Street as she looked left so she kept proceeding towards the intersection while turning her head to the right to search for traffic traveling in the other direction on Willow. Since there were no vehicles approaching from either direction, she entered the intersection, still not applying pressure to the gas pedal. Once in the intersection she crossed the first two lanes of Willow without mishap. As she was entering the turning lane zone of Willow she looked back to her left just in time to see the Touchet vehicle before they collided. According to Mrs. Champagne, the Touchet vehicle, a small Datsun, was upon her too quickly for her to ever apply her brakes, although she attempted to do so.
On that same day, Troy Touchet, age 17, a professional horse racing jockey, finished exercising a horse around 12:00 noon. He then went home and took a nap. He later left his home with his brother, Glenn, age 15, around 4:30 p.m. and went to a horse farm where they met Howard Edmond. According to Troy, the three of them left the horse farm around 6:30 p.m. and traveled to Breaux Bridge and later to Henderson to visit friends. During this time period, according to Troy Touchet, they did not drink any beer. When they left Henderson it was starting to get dark. They then traveled to the Bear's Den in Carencro where they met Ambrose Johnson around 8:30 p.m. The Bear's Den is a pool hall where alcohol is not allowed. Troy, Glenn and Howard Edmond shot pool while at the hall. After finishing at the Bear's Den they invited Ambrose Johnson to ride with them while they brought Howard Edmond *415 home. On the way back to Breaux Bridge the foursome saw two girls crossing the road to a fair located near Northgate Mall. Troy and his brother, Glenn, wanted to speak with the girls so Troy parked the car in the Northgate Mall parking lot and they proceeded to the fair on foot. They stayed at the fair for 30 to 45 minutes, until it started to close down around 10:15 p.m. Troy testified that no person riding in his car had any alcohol to drink while at the fair. After leaving the fair, at approximately 10:30 p.m., they decided to stop at a convenience store on Willow Street to purchase some beer. According to Ambrose Johnson's testimony, all four of them went into the store. According to Troy Touchet's testimony, only Howard Edmond entered the store to purchase the beer. Troy and Ambrose supposedly stayed in the car while Glenn Touchet got out to make a telephone call. Troy further stated that at that time he did not want anything to drink since he had just eaten. However, after leaving the store, he admitted to having popped open a beer just before the accident.
After leaving the convenience store the foursome traveled west on Willow Street in the outside lane. Troy testified that he traveled slowly down Willow to the intersection where the accident happened. He stated that he was very familiar with the intersection. According to Troy, when he got to the intersection he stopped in the outer lane, having seen the red flashing light, looked three times to his right (which would have been the direction Mrs. Champagne was coming from), looked to his left, saw no traffic from either direction so he proceeded to cross the intersection still in the outer lane. Troy stated that he had crossed two and one-half lanes of traffic before he started to look back to his right again, just in time to see the headlights of the Champagne vehicle quickly approaching his car on a collision course. However, during his deposition, he indicated that he never looked back to the right again and never did realize that a vehicle was southbound on Moss Street.
The pick-up truck was damaged approximately from the left side of the left fender to the middle of the front. The Touchet Datsun showed damage to its entire right side. Neither vehicle left any skid marks from braking, and neither driver apparently had time to veer one way or the other, or use their horns. The vehicles did leave some gouge marks at the point of impact, and some other marks before they came to rest.
Various witnesses had differing estimates of the amount of fog in the area of Moss and Willow streets that night. The investigating police officer, who arrived soon after the accident, stated that there was a "very light, haze of fog". He said that the fog did not cause "any visual obstruction" and that "you could see three or four blocks". A professional meteorologist from KLFY-TV 10, accepted as an expert, stated that from weather observations made at Lafayette airport, he estimated that the parties to the accident should have been able to see for 1/16 to 3/16 of a mile, or 3-4 city blocks.
Mrs. Champagne testified that when she left her home at 10:30 p.m. the weather was clear. She later clarified this by stating that she could see 3-4 blocks without any problems. Troy Touchet and Ambrose Johnson both declared that the fog was thick. However, neither of them stated how far they could see in the fog. Troy Touchet did indicate that the intersection of Moss and Willow streets was well lighted.
The investigating police officer placed the point of impact in the inside lane of Moss Street and in the turning lane of Willow Street, almost at the heart of the intersection. He indicated that the Touchet vehicle was in the inside lane at the time of impact, not in the outside lane as Troy had testified. He estimated the speed of the Champagne vehicle at 30 mph. After the impact the Touchet vehicle traveled another 106'2" and came to rest in the Eckerd Drug Store parking lot. The Champagne vehicle traveled 89'4" after impact and came to rest facing north on the south-west corner of Moss Street. The pick up struck *416 a telephone or electrical pole at this location.
During his investigation, the police officer noted that the weather was good, except for the very light fog, and that the pavement was dry. He also stated that the flashing yellow and red signals were working properly. In his accident report he concluded that the contributing factors of the accident included traffic violations by Touchet; Troy Touchet's condition; the traffic controls; and, the weather. When asked about these factors, he opined that Troy had most likely run through the red flashing signal, and that Troy had probably been drinking. He later stated that he thought Touchet had not stopped at the corner due to the markings on the road. He did admit that no witness told him that Troy had run the red flashing light. He also admitted that he did not personally smell Troy's breath for alcohol, instead the whole inside of the Datsun was emitting an alcohol aroma due to the broken beer bottles. After Troy was transported to the hospital, the police tried to get a blood sample for alcohol testing purposes. Their request was denied by hospital personnel. Thus, the amount of alcohol in Troy's system, if any, was never scientifically determined.
The police officer, who was the evidence custodian for the Lafayette Parish Police Department, testified that he was given 17 beer bottles, some closed and full, some open and empty, some broken, by the police officer who searched the impounded Touchet vehicle. These bottles, which were admitted into evidence, were recovered almost 24 hours after the accident. However, there was testimony that the car had not been tampered with during this period of time. Most of the bottles were found unopened.
A third police officer testified that he spoke with Ambrose Johnson the day after the accident. Johnson was in the hospital under medication for pain. During this conversation, Johnson indicated that the parties in the Touchet vehicle had been to Northgate Mall and that they had been drinking prior to the accident. He did not indicate the quantity of alcohol consumed but he did say they had been to several places and had consumed alcoholic beverages during that time. During this interview, shortly after the accident, Johnson said that he could not remember any details about the accident. However, during his testimony at the trial, Johnson was able to remember a number of events leading up to the accident, such as stopping at the red blinking light and seeing Troy Touchet look to the right to check for traffic. He also stated at trial that they had not been drinking prior to purchasing the beer at the convenience store. Johnson stated on cross examination that he could not remember the events of the accident because he had blacked out.

ISSUE NO. 1
Appellants contend that the jury erred when it did not find Mrs. Champagne at fault to any degree. Our careful review of the record reveals no clear error in the jury's determination. Therefore, we affirm.
LSA-R.S. 32:234 states, in pertinent part:
"A. Whenever an illuminated flashing red or yellow signal is used in a traffic sign or signal, it shall require obedience by vehicular traffic as follows:
(1) FLASHING RED (STOP SIGNAL)
When a red lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest cross-walk at an intersection or at a limit line when marked, or, if none, then before entering the intersection, and the right to proceed shall be subject to the rules applicable after making a stop at a stop sign.
(2) FLASHING YELLOW OR AMBER (CAUTION SIGNAL)When a yellow lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through or past such signal only with caution."
Under this statute, the driver facing the flashing yellow or amber signal has the right-of-way and the right to assume that *417 vehicles on the inferior street facing the red flashing signal will honor that right-of-way. The driver on the favored street can proceed under this assumption until he sees or should have seen that the other car will not observe the law. Pecunia v. Gaudet, 217 So.2d 511 (La.App. 4th Cir.1969); Spencer v. Hynes, 452 So.2d 1291 (La.App. 3rd Cir.1984), and cases cited therein.
Further, the motorist confronted with a flashing yellow signal must exercise caution and vigilance and must ascertain that the crossing can be safely negotiated. The degree of caution required by such motorist includes approaching the intersection at a reasonable speed and maintaining a proper lookout for danger. What constitutes reasonable speed and proper lookout must, of course, be determined in light of the circumstances of each individual case. Insured Lloyds v. Liberty Mutual Insurance Co., 286 So.2d 420 (La.App. 1st Cir. 1973).
After reviewing the record in this case, we conclude that the jury did not clearly err in determining that Mrs. Champagne complied with the duty imposed by La.R.S. 32:234 and was not otherwise guilty of any negligence.
Mrs. Champagne approached the intersection with caution at a slow speed. She had decelerated to 30 mph in a 40-45 mph zone. Deceleration before entering an intersection constitutes the caution required by LSA-R.S. 32:234A(2). McMillan v. State Farm Mutual Automobile Insurance Co., 356 So.2d 1368 (La.1978). Besides decelerating, Mrs. Champagne looked to her left, and to the right before she entered the intersection. When she looked to the left again her view was partially obstructed by the laundry which was set back a short distance from Moss and set very close to Willow Street. As she continued into the intersection she kept on decelerating. According to the police report, she had already crossed two lanes of the intersection of Willow Street when the accident occurred. It was only after the Champagne vehicle entered the intersection that Mrs. Champagne noticed, at the very last moment, that the Touchet vehicle was also in the intersection. When the collision happened Mrs. Champagne still had not started to accelerate. Instead, she apparently attempted to hit her brakes, but the suddeness of the accident prevented her from doing so.
Apparently, the jury must have decided that Mrs. Champagne pre-empted the intersection and that the Touchet vehicle ran through the red flashing light on Willow Street at such a speed that Mrs. Champagne did not have a chance to see it before the collision. After reading the record, we cannot say that this conclusion was manifestly erroneous.
Troy Touchet and Ambrose Johnson presented enough contradictory testimony for the jury to have concluded that their versions of the accident were fabrications. Their credibility was further in question due to the circumstantial evidence presented which pointed to the strong possibility that the occupants of the Touchet vehicle had been engaged in the consumption of alcohol for some time before the accident. A fact may be established by circumstantial as well as by direct and positive proof. Martin v. Blossman, 405 So.2d 1157 (La. App. 1st Cir.1981), and cases cited therein.
Additionally, if Troy had stopped at the corner as he testified, then there would have been nothing obstructing his vision of Moss Street to the north for at least 1/16 to 3/16 of a mile (330 to 1000 feet). He would have easily seen the Champagne vehicle which was proceeding south on Moss Street in the inside lane. But, according to his own testimony, he did not see the Champagne vehicle. This lends credence to the view that Touchet never stopped at the flashing red light. If he did stop at the intersection then he had a duty not to proceed into the intersection until it was safe to do so. Pecunia, supra. With this in mind, we do not feel that it was clearly wrong for the jury to conclude that Touchet came down Willow Street at an excessive rate of speed for the conditions present, and then ran through the flashing *418 red light, at a time and under such circumstances as to make virtually impossible any evasive action on the part of Mrs. Champagne.
For these reasons, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] Judge John S. Pickett, Jr. of the 11th Judicial District Court and Judge Roy B. Tuck, Jr. of the 30th Judicial District Court participated in this decision as Judges Pro Tempore of the Third Circuit Court of Appeal.
[2] Felicia Marie Girouard is the illegitimate child of Howard Edmond and Joyce Girouard.