448 So.2d 829 (1984)
Mary Jean Pullig WILSON, Plaintiff-Appellant,
v.
WAL-MART STORES, INC., Defendant-Appellee.
No. 16-097-CA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1984.
*830 Paul B. Wilkins, Columbia, for plaintiff-appellant.
Theus, Grisham, Davis & Leigh by Phil D. Myers, Monroe, for defendant-appellee, Wal-Mart Stores, Inc.
Mayer, Smith & Roberts by Alex S. Lyons, Shreveport, for third party defendant-appellee, Paul F. Stewart.
Lunn, Irion, Switzer, Johnson & Salley by Michael S. Hubley, Shreveport, for third party plaintiffs-appellees, Robert E. Riddle and Charles Harold Allen.
Grant, Dean, Kneipp, Luffey, Price & Dunn by Kirby O. Price, Monroe, for third party defendant-appellee, Triple R. Construction Co., Inc.
McLeod, Swearingen, Verlander & Dollar by Richard A. Bailly, Monroe, for defendant-appellee, Ruston Glass and Mirror Company, Inc.
Before MARVIN, SEXTON and NORRIS, JJ.
*831 MARVIN, Judge.
From a judgment awarding personal injury damages to plaintiff, a 49-year-old grandmother, who slipped and fell entering a Wal-Mart store, plaintiff appeals, seeking to increase the award.
In answer to the appeal, Wal-Mart claims that if plaintiff was not contributorily negligent, as it contends, the owner of the building should be liable on Wal-Mart's third party demand. Wal-Mart does not complain that its demands against other third party defendants were rejected. We amend to increase the award from $154,000 to $174,000 and otherwise affirm.
It rained intermittently on May 16, 1980, but was not raining when plaintiff entered the vestibule of the store about 2:20 p.m., accompanied by her daughter and two young grandchildren. The vestibule had recently been extended six feet on each end where new doors had been installed. Puddles of water had accumulated in the vestibule. Plaintiff slipped and fell after she walked across the door mat and onto the asbestos-type tile floor in the west end of the vestibule. Plaintiff and her daughter testified that plaintiff's shoe left a mark or impression in what they described as the dirt, mud and grime that covered the floor where plaintiff fell. Plaintiff intentionally protected the 10-month-old child in her arms and was unable to cushion her fall. She sustained serious injury.
Wal-Mart contended that the accumulation of water was caused by leaks around the new doors and brought third party actions against the architect, the general contractor, the sub-contractor, as well as against the owner of the building, Wal-Mart's lessor. Wal-Mart questions the correctness of the rejection only of its third party demand against the owner.
A female employee immediately investigated the accident and reported that the floor was tracked with mud and with puddles of water. She indicated that the area had last been cleaned or swept about 9:00 p.m. the night before. A male employee testified that he found a large puddle of water in the west end of the vestibule before the store opened on the morning of the accident and instructed a stock boy to mop the area. This employee said that he saw a stock boy mopping at the west end of the vestibule where plaintiff fell when he left for a late lunch about 2:00 p.m., 20 minutes before the accident. The trial judge was not impressed, and did not find this employee's testimony convincing.
The record shows that Wal-Mart knew of the accumulation of water, had not replaced the door mats during the day, and did not have a specific policy requiring periodic inspection of the vestibule area during business hours by any particular employee. The circumstances revealed in this record support the conclusion that Wal-Mart was negligent in failing to correspond to the standard of care required of a retail merchandiser with a large volume of merchandise and customers.
Where a customer of a retail establishment shows that she slipped on a foreign substance on the floor of the establishment, the retailer may avoid liability only by showing that it took reasonable measures to protect against such an occurrence, periodically inspecting and cleaning the floors, changing mats, and providing adequate lighting and warnings. See Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976).

CONTRIBUTORY NEGLIGENCE
Once the retailer's liability is established, as it is here, the issue of the customer's contributory negligence is one which must be decided in the light of the circumstances of each case. Soileau v. South Cent. Bell Tel. Co., 406 So.2d 182 (La. 1981); Moran v. Montgomery Ward & Co., Inc., 424 So.2d 1207 (La.App. 1st Cir.1982). In Moran, for instance, a plaintiff was found contributorily negligent because she had shopped before in the garden department of the store where the floor remained wet because of the operation of a sprinkler system that watered the plants displayed for sale. The court of appeal affirmed the jury's finding, stating that the area was *832 "well li[ghted]" and that plaintiff had been through the garden shop before where the water was "quite noticeable." 424 So.2d at 1210.
Here the trial court agreed with plaintiff's belief that she was "proceeding with prudence" with her grandchild in her arms, apparently because plaintiff was confronted first with the door mat which was not noticeably wet when she entered the vestibule. The floor of the vestibule was not wet down by a sprinkler system as was the Montgomery Ward garden shop but held puddles of water near the door mat. Even though these puddles were noticeable to everyone after the accident when attention was drawn to them, we cannot say that the trial court erred in concluding plaintiff was not contributorily negligent in not noticing them under the circumstances. We agree that plaintiff, with an infant in her arms, proceeded reasonably.

THE OWNER'S LIABILITY
Wal-Mart argues that CC Arts. 2317, 2322, and 2695 should be applied to require the owner-lessor of the building to indemnify Wal-Mart for the "loss" that resulted to it (the liability to plaintiff) from the alleged "defect" in the doors of the vestibule. CC Art. 2695.
Wal-Mart urges that water had leaked into the vestibule on the morning of the accident before the store was open and that the newly constructed doors caused more exposure to rain water and constituted a defect in the premises.
Whether a building poses an unreasonable risk of injury to others is an issue that requires careful legal analysis to determine the scope of the duty or legal cause of the injury, relating or balancing the risk created by the thing with the social utility of the thing. Entrevia v. Hood, 427 So.2d 1146 (La.1983). The issue is more than one of cause-in-fact and is resolved in the "strict" liability case by the analysis that is similarly employed in the negligence case. 427 So.2d at 1149.
Even should we agree, arguendo, with the premise that water had leaked around and under the doors, we cannot agree with Wal-Mart's ultimate conclusion. The expert testimony can easily be interpreted to establish that it is impossible to make swinging doors of the type used here and on most retail buildings completely watertight. It may also be easily concluded that the mud and grime that accumulated on the floor caused the fall and resulted from customer traffic rather than from leakage or seepage of rain water around the doors.
It has not been shown that the assumed leakage produced a quantity of water which, with reasonable attention, could not have been controlled or sealed off from customers, especially if Wal-Mart knew of the water as early as its employee indicated. Compare Burgess v. City of Shreveport, (La.App. 2d Cir.1984), and Entrevia, supra. In the light of these circumstances, the trial court's conclusion that there was no defect which presented an unreasonable risk of harm was not clearly wrong.

GENERAL DAMAGES
As a result of the fall, plaintiff sustained injuries to her lower back, right knee and ankles. She was taken to Dr. Dennie's office in Jonesboro immediately after the fall and was admitted to the hospital on that same day. Dr. Dennie diagnosed a severe lumbosacral sprain, a contusion to the right hip and knee, and a mild sprain to both ankles. He admitted her to the hospital because of severe pain in the lower back and right hip and treated her with pain and anti-inflammatory medication. She continued to see Dr. Dennie for pain until August 1980.
On July 3, 1980, plaintiff saw Dr. Rambach, an orthopedic surgeon. He found that she had bruised her lumbosacral area, but did not find indications of any mechanical nerve root compression. Dr. Rambach hospitalized plaintiff on August 26, 1980, for treatment of possible intervertebral disc herniation and for low back and leg pain. A lumbar myelogram could not be *833 performed because plaintiff was allergic to the dye. An electromyographic study (EMG) was performed. This study did not then indicate a ruptured disc. Plaintiff was given physical therapy and pain medication and was released on September 5, 1980. Dr. Rambach then referred plaintiff to Dr. Greer, a neurosurgeon.
Dr. Greer saw plaintiff on October 13, 1980. He conducted some neurological tests and thought that plaintiff might have a ruptured disc at the L5 level. Dr. Greer sent plaintiff to Dr. Wood in Memphis. Dr. Wood recommended that a CT scan be done since a myelogram could not be performed. Plaintiff was hospitalized by Dr. Greer on November 30, 1980, for the CT scan. The CT scan indicated a ruptured disc at the L5 level which was surgically removed on December 5, 1980. Dr. Greer noted during surgery that the S1 nerve root was very swollen. Plaintiff saw Dr. Greer again on December 30, 1980, and February 10, 1981, with complaints of pain in her lower extremities. She was hospitalized again on February 11, 1981, for testing of her upper back. These tests were negative. During this hospitalization plaintiff saw Dr. Erwin, a psychiatrist, who said that plaintiff was suffering from an anxiety neurosis. Upon discharge, plaintiff was referred to Dr. Joe M. Smith of Shreveport, a specialist in physical medicine and rehabilitation.
Dr. Smith began treating plaintiff in February 1981. He found evidence of pain over her left hip caused by nerve root pressure in the L5 area. He hospitalized plaintiff, performed an epidural nerve block to relieve the pain, and began physical therapy. After discharge plaintiff continued on pain medication and was given an exercise program. Dr. Smith hospitalized plaintiff again in July and September 1981 and in July, October, and December of 1982. Treatment during these hospitalizations consisted of epidural nerve blocks, physical therapy and pain medication.
Three of the doctors opined that plaintiff may have exaggerated the severity of her pain. Dr. Greer assessed plaintiff with a twenty percent permanent disability. Under these circumstances we cannot find that the general damage award of $100,000 is an abuse of the trial court's discretion.

LOSS OF EARNINGS

FUTURE MEDICAL

MAID SERVICE
Dr. Smith, who began his treatment in February 1981, said that plaintiff could and should perform employment duties where she could stand and move around from time to time. He was of the opinion that this type activity would increase the pain killing substances in the body and would benefit plaintiff and ease her pain. Dr. Smith suggested that plaintiff should begin working three or four hours a day and gradually increase her working time.
Plaintiff had worked from time to time before the accident and at other times chose to be unemployed for several months at a time. Her working history in the last decade was:
1971-1972Horton's Grocery, part-time and full-time cashier.
1972-1973Jackson Parish School Board, part-time lunchroom worker.
1974-1975Salley Grocery Company, cashier.
1976-1978Gravel's Drug Store, part-time clerk.
Plaintiff was not employed for several months at a time in between these jobs. She was never fired from these jobs, but rather she chose to quit her employment. She quit working for Gravel's Drug Store in 1978 because her husband wanted her to stay home. Most of the jobs she held paid only the minimum wage and she did not work 40 hours weekly with any consistency.
About a month before the accident, plaintiff separated from her husband and sought employment. She and her husband reconciled before the trial.
Dr. Smith said that plaintiff would probably require some future hospitalization and treatment for pain. He said she might be *834 sent to a chronic pain center for treatment, but explained that he had done everything for her that would be done in a pain center. Dr. Smith would discourage further hospitalization because, in his opinion, it would psychologically reinforce plaintiff's complaints of pain.
As before mentioned, three of the doctors agreed that plaintiff was at least guilty of "some exaggeration" of her complaints. The trial court also made this observation.
It is true that earning capacity is not measured by actual loss (Folse v. Fakouri, 371 So.2d 1120 (La.1979)) and that future medical expenses should not be denied because it is impossible to establish the exact cost of it (Cushman v. Fireman's Fund Ins. Co., 401 So.2d 477 (La. App. 2d Cir.1981)). Cushman affirmed a trial court award for maid service. There, however, a maid had been employed. Here plaintiff's unemployed husband attends to services that plaintiff cannot do.
Even though the trial court did not discuss plaintiff's claim of loss of earning capacity, future medical expense, or maid service, we must view the record most favorably toward supporting the judgment which did not award damages for these items. Commercial Union Ins. Co. v. Stidom, 408 So.2d 285 (La.App. 2d Cir.1981). The award for general damages and lost wages ($124,000), plus medical expenses ($30,759.83) is within the range of discretion afforded a trial court. Any increase for impairment of earning capacity and future medical that we might award should be the lowest amount we would have affirmed. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
The trial court obviously was not impressed with plaintiff's complaints. In view of the circumstances, any finding that the trial court erred in failing to award damages for loss of earning capacity, future medical expense and maid service becomes somewhat tenuous. Nonetheless, this plaintiff has shown some impairment of earning capacity and some probability of some future medical treatment. We shall minimally increase the awards as the law directs. We believe a minimal increase of $20,000 is reasonable under the circumstances of this record for both items. We find no error in the trial court rejecting plaintiff's demand for maid services, past and future.

DECREE
As here summarized, and except to the extent we have modified, we adopt the reasons given by the trial court for the judgment. At the cost of appellee, we amend to increase the judgment from $154,759.83 to $174,759.83, and as amended, we AFFIRM the judgment.
SEXTON, J., concurs.