494 So.2d 1283 (1986)
Randy G. BORDELON, Plaintiff-Appellant,
v.
AETNA CASUALTY & SURETY COMPANY, et al, Defendants-Appellees.
No. 18015-CA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 1986.
*1284 Evans, Feist, Auer & Keen by George H. Mills, Jr., Shreveport, for plaintiff-appellant, Randy G. Bordelon.
Lunn, Irion, Johnson, Salley & Carlisle by Frank M. Walker, Jr., Shreveport, for defendants-appellees, Aetna Cas. & Sur. Co., Charles B. McCatheran d/b/a W.I. Trucking and Raymond D. Jackson.
Nelson W. Cameron, Shreveport, for plaintiff-in-reconventionappellant, Raymond D. Jackson.
Rogers & White by David L. White, Bossier City, for defendants-in-reconvention, Randy G. Bordelon & Mid-American Indem. Co.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
This case arises from a collision between a car and an eighteen-wheeler. The plaintiff, Randy Bordelon, was driving a Pontiac Phoenix. The defendant, Raymond Jackson, was driving an eighteen-wheeler loaded with lumber, was working for his employer, defendant Charles McCatheran d/b/a W.I. Trucking, and was insured by his employer's insurer, defendant Aetna. Bordelon sued the defendants for personal injury, property damage, and various items of special damage. Jackson reconvened against Bordelon and his liability insurer, Mid-American Indemnity, for his own injuries and special damages. Jackson also cross-claimed Aetna on its UM provisions. Finally, Jackson's wife and children intervened against Bordelon, Mid-American and Aetna for loss of society and affection. Before trial, the Jacksons dismissed their claims against Aetna. After a three-day trial, the court found that Jackson was entirely at fault in causing the accident. Thus his reconvention and cross-claim, as well as his family's intervention, were dismissed. On the principal claim, however, Bordelon received special damages for his medical expenses, lost income and property damage, plus $30,000 in general damages. Jackson and his family members have appealed, and are joined by Aetna, in raising the following issues:
(1) Whether the trial court properly interpreted the highly conflicting accounts of the accident to hold Jackson entirely at fault; and
(2) If not, what was Bordelon's percentage of fault and how much were Jackson's damages.
Bordelon has also appealed, raising these issues:
(3) Whether the general damage award was abusively low; and
(4) Whether the trial court erred in denying the claims for car rental and sitting expenses.
For the reasons expressed, we amend and affirm.

FACTS AND ISSUE # 1
The accident occurred around 6 p.m. on March 21, 1984.[1] Jackson was driving the 18-wheeler, loaded with lumber, west on Stoner Street in the direction of the intersection with Centenary. The intersection is regulated by a traffic light. Jackson had pulled onto Stoner Street some ways back, after a left turn from Youree Drive. He testified that as he approached the entrance of a graveyard some 300 feet east of Stoner's intersection with Centenary, he glanced up at the traffic light and saw it was green. He never looked at the light again but proceeded straight to the intersection. It was as he entered the intersection that he collided with Bordelon's car.
*1285 Bordelon's path of travel was disputed at trial. Despite Jackson's testimony that Bordelon was traveling east on Stoner and made an impetuous left turn directly into Jackson's path, the trial court found by a "vast preponderance" of evidence that Bordelon had been driving north on Centenary. This was the testimony of Bordelon, who added that his signal was green so he had not stopped or slowed, but simply had driven into the intersection when Jackson hit him. Bordelon's friend, Sidney Green, corroborated that according to prior plans, Bordelon was driving from his apartment to Green's house on a path that would have required him to drive north across Stoner. Two Shreveport police officers testified that from the scrape marks on the road, Bordelon must have been traveling north on Centenary. Finally, there was the testimony of numerous eyewitnesses. All but one testified that Bordelon was going north. The correctness of the trial court's finding on this score is not on appeal.
The testimony was more equivocal, however, on other factual questions, and these form the basis for Jackson's first issue on appeal. Jackson suggests, in essence, that Bordelon either ran a red light or "jumped" a green light that had just turned, before making sure that the other traffic had cleared the intersection.
The evidence was long and conflicting so we will give only a brief summary of it. Jackson admitted to an insurance adjuster the day after the accident that he had run a red light, but he denied this at trial, insisting that the light was green the last time he saw it. Bordelon testified by deposition and at trial that his light on Centenary had been green for about twenty seconds. The other eyewitness testimony was very confused. Mr. Foulk, who was waiting at the red light on Stoner headed east, completely corroborated Bordelon's version of events. According to Foulk, Bordelon did not stop. Mr. Stewart, a student driver for Sportran, claims to have been just behind Bordelon's car on Stoner as they both waited for the light to turn green. According to Stewart, the light turned green and Bordelon entered the intersection, only to be hit in the side by Jackson. Neither Bordelon nor Foulk remembered any bus in the vicinity. There were three witnesses standing in a yard about three houses down from the corner. One of these, Ms. Brooks, testified that Bordelon had not stopped at the intersection. Another, Mrs. Nash, said she saw his car stopped at the light. The third witness, Mrs. Nash's daughter, did not specifically say what she saw. Mr. Cline, the bus driving instructor, testified that Bordelon was going east on Stoner, so the trial court obviously disregarded his testimony.
Bordelon also called as a witness a Mr. Cater, a city traffic engineer. He brought along an "inventory" of the intersection. He testified rather clearly that if Jackson had entered Stoner by a left turn off Youree, then he would have to have received a red light at Centenary. This means that Jackson definitely ran a red light. Mr. Cater also stated, however, that when a northbound driver on Centenary is stopped at Stoner, he must first wait through a 9.9 second left-turn only arrow for southbound traffic. This is followed by a 3.6 second yellow arrow. Only then does the northbound traffic get a green light. This indicates that there was an interval of 13.5 seconds during which both Jackson and Bordelon should have been stopped at the intersection. Mr. Cater admitted that some of the information on his inventories had been superseded. R.p. 428. He also admitted that his appraisal of the traffic flow was based on cars driving at normal speeds. He did not say how a driver like Jackson, whose heavily loaded truck would not have very much acceleration, might progress from Youree to Centenary.
Jackson's argument on appeal is that Bordelon must have run the red light, or at least jumped prematurely through a green one before Jackson had cleared through. Thus, Jackson urges, under any interpretation of the facts, Bordelon is partly at fault and comparatively negligent. He points to the testimony of Mrs. Nash and Mr. Stewart, not for the proposition that Bordelon was waiting obediently *1286 at the light, but to argue that Bordelon must have proceeded through the intersection an instant before his light turned green. He correctly asserts that a motorist who enters an intersection just as his light changes to green, without waiting for the traffic already in the intersection to clear it, is guilty of negligence. Mooring v. Pomeroy, 175 So.2d 435 (La.App. 2d Cir. 1965), writ denied 248 La. 117, 176 So.2d 450 (1965); Champagne v. Forest Product Transport, 418 So.2d 18 (La.App. 1st Cir. 1982), writ denied 422 So.2d 162 (La.1982). Under these circumstances, a driver must exercise slight caution to allow the cross traffic, already in the intersection, to clear. Earles v. Volentine, 191 So.2d 740 (La. App.2d Cir.1966), writ denied 250 La. 21, 193 So.2d 529 (1967); Cumis Ins. Soc. v. Christidis, 418 So.2d 730 (La.App. 4th Cir. 1982).
Jackson correctly observes that the testimony is equivocal and subject to diverse interpretations. It is not sufficient, however, to show that a different interpretation of conflicting evidence is possible or even more reasonable. Rather, the appellant must show that the trial court's interpretation is clearly wrong. The supreme court discussed the appropriate standard of review in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978):
[T]he appellate court should not disturb such a finding of fact unless it is clearly wrong. Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable basis for the finding of the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong. 365 So.2d at 1333
If the only evidence to support the trial court's finding were Bordelon's own testimony, as Jackson seems to urge on appeal, then indeed we would be treading close to the danger zone of manifest error. But as we read the entire record we find ample evidence to rebut the claim of manifest error. Mr. Foulk and Ms. Brooks both corroborate Bordelon's version of events, that Bordelon did not stop at the intersection. Mr. Stewart, even though he said he was stopped there, agreed with Bordelon's testimony that the light was green. As for Mr. Cater's testimony, he did not know how far down Centenary Bordelon was, so his statements cannot be interpreted to mean that Bordelon must have run or jumped the light.
Given all the confused and conflicting versions, we cannot say with certainty from the cold record whether Bordelon stopped and waited, or even slowed down. The trial court had the opportunity to observe the witnesses and to assess their credibility and its conclusion that he went through a green signal is by no means manifestly erroneous. We will not disturb it.

ISSUE # 2
Jackson also urges in a separate argument that we should make a new apportionment of fault. We will not do so because we find the trial court's analysis of this difficult evidence was not manifestly erroneous. We have held that a trial court's apportionment of comparative fault is a factual issue not to be disturbed without a showing of manifest error. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App.2d Cir.1984); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). See also Varnado v. Continental Ins. Co., 446 So.2d 1343 (La.App. 1st Cir.1984); Triangle Trucking Co. v. Alexander, 451 So.2d 638 (La.App. 3d Cir.1984).
Jackson's argument here is motivated by the erroneous assumption that whenever a trial court absolves one of the parties to a vehicular collision of all fault, then the court is unwittingly lapsing into the pattern of pre-comparative law. Under the old scheme, a plaintiff partly at fault would be denied recovery. See LSA-C.C. art. 2323 (before amendment, LSA-Acts 1979, No. 431). Since the old scheme of contributory negligence is abolished, trial courts have liberty to assess fault against a plaintiff whose conduct was substandard, without the inequity of denying all recovery. This *1287 does not mean, however, that every collision must result in a finding of comparative fault. See Finley v. Bass, supra. True, in those instances where the trial court finds one party to be not at fault, the result bears a resemblance to the typical pre-comparative judgment. But this does not mean the trial court has reverted to the repealed law. It rather means that his interpretation of the evidence led to a factual finding that one party was not negligent. We will not disturb this finding unless it is manifestly erroneous. Arceneaux v. Domingue, supra.
We have concluded that the trial court's findings and allocation are not manifestly erroneous. Those aspects of the judgment are affirmed.

ISSUE # 3
In his posture as an appellant, Bordelon claims that his general damage award is abusively low. He claims in essence that the trial court erred in not fully appreciating the extremely long recovery time, the continuous pain and the hematoma that has never fully dissolved. These problems, he maintains, have led to additional losses for embarrassment, humiliation and anguish.
Even though Jackson ran into the passenger side of Bordelon's car, the impact was great and caused many injuries. Bordelon was knocked unconscious for a few minutes. He was jarred back into consciousness by the sensation of being dragged from the wreckage by firemen who arrived on the scene. He was taken to the hospital, but was unconscious again when he was checked in. He had a broken collarbone and five ribs broken in seven places. As a result of the punctures by the broken ribs, he suffered a collapsed lung. A pulmonary tube was inserted to drain the fluid and restore the lung. He had to be catheterized and to have tiny glass fragments removed from his eyelids and skin. He also had a bruised kidney that made his urine bloody for several days.
Bordelon spent two days in intensive care before moving to a private room. Any movement, even as slight as a cough or a sneeze, was painful because of the breaks in the rib cage. He was on Demerol for a day or so but then reduced to Tylenol 3, which is less effective against pain. By about a week after the accident, he was able to walk around his hospital room. He was discharged on March 31, ten days after the accident. He was nevertheless still unable to tend to his personal needs, such as dressing, bathing and relieving himself, without help. Joyce Tullis, his sister from Ball, Louisiana, came up and stayed with him for a week at his apartment in Centenary Terrace. She then drove him down to her home where she cared for him for about three weeks. He remained in Ball for two more weeks, recuperating and having therapy at Rapides General. When he returned to his apartment in Shreveport on May 11, the pain had substantially abated but was not completely gone. He had developed a hematoma on his right side. It had shrunk somewhat but was still large enough to make him uncomfortable in his old clothes. Bordelon returned to work as a juvenile probation officer on June 4.
He has alleged a number of problems that are not entirely physical. Because of the trauma of the accident, he has suffered from nightmares and bouts of sleeplessness. He has been depressed and has been mortified by subsequent near-accidents. He has reacted poorly to stress, and this has impaired his performance at work. Moreover, the discomfort and embarrassment about the lumpy hematoma, he claims, have thwarted his subsequent efforts to engage in sexual activity; he has been unable to complete the sexual act. He finally complains that the lingering discomfort and occasional pain have abridged his normal athletic activities such as walking, jogging and lifting weights. He has given up singing in the choir because of residual chest pain.
Bordelon has cited to us a few cases of allegedly similar accidents where the plaintiff received large awards. We are not at liberty, however, to compare prior awards in the effort to establish the reasonableness of a particular award. We *1288 must rather study the circumstances of the particular case for an independent judgment of whether the trial court's award was an abuse of its great discretion. Only if we find abuse will we refer to prior awards. Reck v. Stevens, 373 So.2d 498 (La.1979).
We have closely studied the facts and circumstances of the accident, the injuries and the recovery. We agree that the accident and injuries were extremely painful. The treatment, especially the chest tube, the catheter and the glass extraction, were also difficult and painful. We note, however, that he was unconscious immediately after the accident, and that he was heavily medicated during the first part of his hospital stay. The medicine, while not perfect, surely reduced the pain and made it less excruciating. Bordelon seems to have made good progress as he was able to walk a week after the accident. The subsequent recuperation was relatively slow, but thanks to help from family members, he was able to minimize the uncomfortable activities of daily life. By the latter part of April, Mrs. Tullis was no longer waiting on him.
We have also considered the emotional problems, the nightmares, the inability to perform sexually, the anxiety that resulted from reduced mobility, the mild depression, the general change in personality. We are convinced that these problems are real, and note that Bordelon has seen a psychologist. For these and all the physical problems, the trial court awarded $30,000. Although this award is on the low side, we cannot say it is abusively low. If we had read this evidence without the benefit of a prior finding of fact, we may have inclined to a higher award. We do not, however, have the trial court's vantage point and therefore we are not at liberty to substitute our own judgment for his. We will not disturb the quantum.
This aspect of the judgment is affirmed.

ISSUE #4
Bordelon finally contests the trial court's denial of two claims of special damages, the sitting expenses and the car rental. We think both were improperly denied and we will amend the judgment accordingly.
The claim for sitting expenses is based on losses allegedly incurred when his sister, Mrs. Tullis, stayed with him and cared for him during his recuperation. Joyce came to the hospital the day after the accident and stayed with him almost continuously. After his discharge, she took him to his apartment and stayed with him for a week. She then moved him to her own house in Ball, near Pineville, where he stayed for over a month. He gradually began to feed and bathe himself, and finally returned to his apartment on May 11. At trial, Bordelon presented the testimony of Mrs. Mayes, a licensed practical nurse. She testified that for services such as those Mrs. Tullis performed, an LPN would charge $10 an hour. A non-LPN would charge $5-$7 an hour for sitting. Figuring from an average of $6 an hour over the 41 days between March 31 and May 11, 24 hours a day, Bordelon contends he is entitled to a reimbursement of $5,904.
In support, he cites our early case of Williams v. Campbell, 185 So. 683 (La. App. 2d Cir.1938). In Williams, we spoke in general terms:
[T]he majority rule is that an injured person is entitled to recover as an element of damages for his injuries the value of nursing and physicians' services.
* * * * * *
[T]he fact that medical attention and nursing have been rendered gratuitously will not preclude the injured party from recovering the value of such services. 185 So. at 688
The trial court chose instead to rely on our recent case of Wilson v. Wal-Mart, 448 So.2d 829 (La.App. 2d Cir.1984), in which the plaintiff's wife, injured in a slip-and-fall accident, requested recovery of maid services that her unemployed husband provided while she was recuperating. We refused this claim. Our decision was implicitly grounded on the duty of mutual support *1289 that spouses owe one another. LSA-C.C. art. 119; James v. State, 154 So.2d 497 (La.App. 4th Cir.1963). There is no such obligation flowing between Mrs. Tullis and her brother. The Wilson case is therefore distinguished and the trial court was wrong to rely on it.
The vast weight of authority supports an award for nursing services that were gratuitously rendered. In Fullilove v. U.S. Cas. Co., 129 So.2d 816 (La.App. 2d Cir. 1961), writ denied (not reported), we allowed damages for hospital and medical expenses received free of charge from the Veterans Administration. Smith v. Foucha, 172 So.2d 318 (La.App. 4th Cir.1965), writ denied 247 La. 678, 173 So.2d 542 (1965) and Bean v. Toney, 173 So.2d 31 (La.App. 4th Cir.1965) awarded hospital and nursing costs to plaintiffs who had received these services gratuitously from the New Orleans Charity Hospital. Even more notably, the court in Spizer v. Dixie Brewing Co., 210 So.2d 528 (La.App. 4th Cir.1968), allowed the plaintiff to recover damages for his daughter's medical expenses. The expenses had been incurred completely gratuitously because the plaintiff was a physician. With this authority we feel that Bordelon's sitting expenses should have been allowed.
We hold, however, that a claim for sitting expenses rendered gratuitously by nonprofessional family members without a doctor's orders must be viewed with close scrutiny. The need for the services must be shown, the reasonableness of the fee must be established, and the extent and duration of the services must be proven.
The necessity of the services will usually have to be shown by a doctor's orders. In the instant case there were no such orders, but Dr. Green testified that he fitted Bordelon with a clavicle strap; the record establishes that this strap seriously impaired his motion. The assistance of a sitter was therefore necessary.
On the issue of reasonableness, we accept Nurse Mayes's testimony about what a non-LPN would charge for sitting. We will set the award at $6 an hour.
As for the extent and duration of services, we cannot accept Bordelon's argument that Mrs. Tullis devoted 24 hours a day to sitting for the entire 41 days. We will grant the full claim for the first seven days when Mrs. Tullis had to be away from her home, stay with Bordelon at his apartment and perform constant service for him. For the remaining time, Mrs. Tullis was back at her own home and able to attend to her own business. We would not demean the value of having her nearby "on call" in case Bordelon needed her, but we think the record will support eight hours a day for the final 34 days as extent and duration of services. We will therefore set the award for sitting services at $2,640.
Bordelon's last claim is for car rental between May 21 and June 11. The trial court rejected this, reasoning that Bordelon knew from the outset that the Phoenix was a total loss and that he would ultimately have to buy a new car. The standard is that the owner of a vehicle which is a total loss may recover as damages the cost of renting a substitute vehicle for a reasonable length of time until he secures a replacement. Reynaud v. Leonard, 430 So.2d 314 (La.App. 3d Cir.1983); Meshell v. Ins. Co. of N. Amer., 416 So.2d 1383 (La. App. 3d Cir. 1982). What is a reasonable time depends upon the facts and circumstances of each individual case. Brown v. Morgan, 449 So.2d 606 (La.App. 1st Cir. 1984).
Even though Bordelon knew about the total loss from the outset, we think that under the circumstances, renting a car for three weeks was entirely reasonable. On May 21, he had just recently returned to Shreveport and was still complaining of pain. We understand his reluctance to undertake the enterprise of visiting car dealers, taking test drives and dickering with salesmen while still feeling uncomfortable from the accident. We can also understand his reluctance to approach a lender with the story that he had not worked in two months and did not know when he would be working again. We cannot say that Bordelon should have bought a car earlier than he did and we feel the car rental was *1290 reasonable under the circumstances. It should have been allowed.

CONCLUSION AND DECREE
For the reasons expressed, the judgment is amended to include sitting fees of $2,640 and car rental of $768.50. The judgment will read as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of RANDY G. BORDELON and against AETNA CASUALTY & SURETY COMPANY, RAYMOND D. JACKSON, and CHARLES B. McCATHERAN d/b/a W.I. TRUCKING, in solido, for the full sum of FIFTY-TWO THOUSAND, FOUR HUNDRED, FORTY-FIVE & .41/1.00 ($52,445.41) DOLLARS, plus interest from date of judicial demand, as more particularly set forth below:

 * * * * * *
 4a. CAR RENTAL 768.50
 * * * * * *
 5o. Mrs. Joyce Tullis 2,640.00
 TOTAL $52,445.41
 * * * * * *

In all other respects, the judgment is affirmed. Costs of appeal are assessed to defendants Aetna Casualty & Surety Co., Raymond D. Jackson, and Charles B. McCatheran d/b/a W.I. Trucking.
AMENDED AND AFFIRMED.
NOTES
[1] The trial court's written opinion says March 24, 1984, but this is an oversight.