524 So.2d 16 (1988)
Charles A. LEWIS
v.
MACKE BUILDING SERVICES, INC., ABC Insurance Company, David E. Miller, DEF Insurance Co. and Matlack, Inc., Continental Insurance Company, Sheldon G. Knight, and XYZ Insurance Co.
LOUISIANA POWER & LIGHT CO.
v.
Sheldon G. KNIGHT, Matlack, Inc., Continental Insurance Company, David E. Miller and Macke Building Services, Inc.
MATLACK, INC.
v.
David E. MILLER, Macke Building Services, Inc. and P.M.A. Insurance Company.
Nos. 87-CA-718 to 87-CA-720.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 1988.
Rehearing Denied May 17, 1988.
*17 Terrence O'Brien, New Orleans, for defendant-intervenor.
William W. Hall, Matairie, for plaintiff appellee.
Frank A. Fertitta, Robert D. Hoover, Baton Rouge, C. Gordon Johnson and Robert M. Johnston, Thomas S. Morse, Adams & Johnston, New Orleans, for defendant-appellant.
Before GAUDIN, DUFRESNE and WICKER, JJ.
DUFRESNE, Judge.
This is a suit for personal injuries suffered by Charles A. Lewis, plaintiff, when an eighteen wheel truck hit an automobile at an intersection, careened off the highway, and struck the cherry-picker from which Lewis was doing work on overhead electric lines. The truck was owned by Matlack, Inc., was being driven by its employee, Sheldon Knight, and was insured by Continental Insurance Co. The car was owned by Macke Building Services, Inc., *18 was being driven by its employee, David Miller, and was insured by P.M.A. Insurance Co. The cherry-picker was owned by Louisiana Power and Light Co., for whom the plaintiff worked.
Lewis sued Matlack and Macke, and their respective employees and insurers, for personal injuries. LP & L intervened in this suit for recovery of workmen's compensation and medical payments made to Lewis, and in a consolidated case sued these same defendants for damage to the cherry-picker. In yet another consolidated case, Matlack sued Macke, its employee and its insurer for damage to the truck.
After trial on the merits, the trial judge found that the sole cause of the accident was the negligence of David Miller, Macke's employee. He therefore cast Miller, Macke, P.M.A. Insurance Company and Fireman's Fund Insurance Company in judgment for $1,229,441.80 in favor of Lewis, and $81,246.69 in favor of LP & L. The judgment is silent as to judicial interest on these amounts, assessment of costs and Matlack's consolidated suit for damage to its truck. This appeal followed.
The issues before the court are as follows:
1. Was Fireman's Fund properly cast in judgment, when it was never named as a party defendant and never served with process;
2. Did the trial court commit manifest error in finding that the negligence of David Miller was the sole cause of the accident; and thus exhonorating Sheldon Knight from fault;
3. Was the amount of damages awarded to Charles Lewis an abuse of the trial court's discretion;
4. Did the trial court err in failing to award plaintiff interest on the judgment, and in not casting the losing parties in judgment for costs;
5. Did the trial court err in not awarding Matlack damages for its truck.
The first issue is whether Fireman's Fund was properly cast in judgment. This insurance company was never named as a party defendant, was never served with process, and did not appear in any capacity during the entire proceedings. The only mention of Fireman's Fund appearing in the record is a stipulation in which Macke's attorneys admitted that Fireman's Fund had in effect an excess coverage policy insuring Macke in the amount of ten million dollars. At no time did Macke's attorneys assert that they also represented Fireman's Fund, and in post-trial pleadings specifically avered that they did not represent Fireman's Fund.
It is a fundamental principle of law that citation and service thereof are essential in all civil actions, except summary and executory proceedings. Without service, all proceedings are absolutely null, Code Civ.Pro. art. 6, 1201; Peschier v. Peschier, 419 So.2d 923 (La.1982). In the present case, Fireman's Fund was not named a defendant, was not served, and made no appearance in this matter in the trial court. In these circumstances, the judgment is an absolute nullity insofar as it casts Fireman's Fund Insurance Company in judgment, and we so rule.
The next question is whether the trial court committed manifest error in finding that the sole cause of the accident was the negligence of David Miller. The evidence bearing on this point was the deposition testimony of Sheldon Knight (who was deceased at the time of trial), the testimony of John Armstrong, a witness who was driving behind the truck, and expert testimony based for the most part on Knight's and Armstrong's versions of the accident. It should also be noted that Armstrong did not actually see the collision itself and that Miller, the driver of the Macke automobile, was apparently knocked out by the impact and could not even recall having been in the accident. Thus, the only witness who was able to testify as to what happened was Knight.
The general facts are undisputed. Knight was traveling in the right lane of a divided four lane highway at about 45 mph, the posted speed limit, with a 65,000 pound load in his tank truck. As he approached a green light, Miller entered the highway from an intersecting two lane road against *19 a red light. The truck struck the car in the left front fender, then veered to the left across the median and the two oncoming lanes of traffic, and finally struck the LP & L cherry-picker which was parked some 20 feet from the edge of the highway. It was further shown that the steering mechanism of the truck broke on impact with the car, and that the distance from the point of first impact with the car to the cherry-picker was some 245 feet. In addition, Armstrong, who was traveling behind the truck, testified that a Greyhound bus was passing the truck in the left lane as the accident was occurring. Knight stated that he didn't think anything was in the left lane. Macke contends that Knight should have been found at least partially at fault for speeding, not attempting to stop timely and failing to change lanes. These assertions are not supported by Knight's deposition testimony or other evidence in the record. Knight's description of the accident was that as he approached the intersection, he saw Miller "gradually easing up" to the highway.
"And when I saw that he was coming up into the highway ahead of me, I blew my horn and when I blew my horn he lurched right in front of me."
Knight applied his brakes, but was simply unable to stop before hitting the car. He further stated that he could not have swerved into the left lane to avoid the collision within the distance involved because a loaded truck simply cannot be swerved in such a short distance. Armstrong testified that both he and the truck were traveling 45 mph.
The rule as to the duty of a motorist with a green light at an intersection is that he may assume that vehicles with the red light will stop, and he may proceed under this assumption until he sees or should have seen that the other driver will not observe the law. Touchet v. Champagne, 488 So.2d 412 (La.App. 3rd Cir.1986) and cases cited therein. A reasonable reading of Knight's testimony is that he saw Miller slowing down as he approached the light. When it appeared to him that Miller might not in fact stop, he blew his horn, but Miller continued onto the high-way nonetheless. Knight, an experienced truck driver, stated that he could not swerve to avoid the car in the distance available, and could not stop before the collision. Knight thus did everything he could to avoid the accident from the moment he realized that Miller was not going to obey the traffic signal, but to no avail. On this showing, the finding of the trial court that Knight was free from fault, and that the negligence of Miller was the sole cause of the accident, is manifestly correct, both factually and legally.
The next question before the court is whether the trial judge erred in awarding Charles Lewis total damages of $1,229,441.80. For the following reasons, we conclude that that award is excessive, and fix total damages at $702,116.83.
The evidence shows that Lewis was examined on May 14, 1982, in the emergency room of Ochsner Hospital immediately after the accident. He was released, but returned a day or two later complaining of back pain. A CT Scan and X-rays were normal, and he was placed in physical therapy and recommended fit for light duty only. In July, 1982, after two months of conservative treatment and therapy, he consulted Dr. John Schuhmacher, a neurosurgeon. Dr. Schuhmacher's original diagnosis was lumbosacral strain, and he recommended continued back exercises. Two weeks later Lewis returned and stated to the doctor that his back was "o.k." most of the time, but that his symptoms had gotten worse after cleaning his garage. On September 7, 1982, plaintiff returned again stating that his back pains increased when he used his back a lot. In early November, plaintiff again saw the doctor, this time stating that he had returned to regular duty on his job the week before, and that this work caused a recurrence of deep, aching pain. Another CT Scan done that day was normal. The following month, a myelogram was performed, and this test was also normal. On January 17, 1983, Dr. Schuhmacher gave a diagnosis of chronic musculoligamentous injury. He released plaintiff for full duty, but explained that if the problem persisted, he should perhaps *20 consider other employment. He also suggested that plaintiff consult another doctor.
Between March 21, and August 18, 1983, plaintiff made several visits to Dr. Joseph Frensilli, a neurosurgeon. This doctor consistently noted that plaintiff's pain was almost always brought on by exertion, but that between these episodes his back gave him little trouble. Like Dr. Schuhmacher, Dr. Frensilli diagnosed the problem as chronic lumbar strain. He advised Lewis to return to work, but limit his activities, and suggested that he might try a pain clinic.
In October, 1983, plaintiff began seeing Dr. Donald Richardson, a neurological surgeon, on a monthly basis. As with Dr. Frensilli, Dr. Richardson's records indicated that Lewis suffered back pains on an intermittent basis, usually associated with exertion. On February 22, 1984, plaintiff again told the doctor that he was having low back pain in his left leg when he did heavy work, but when he stopped these exertions the pain went away. It further appears that his employment was terminated at about this same time because he was unable to perform his pre-accident work.
Dr. Richardson suggested a diskogram, which was done on April 15, 1984, with positive results in two lumbar discs. During six visits over the next fourteen months, plaintiff continued to complain of pain on exertion. Because his condition did not seem to be improving, disc removal and bone fusion surgery was suggested.
On June 20, 1985, the discs were surgically removed by Dr. Richardson, and Dr. Charles Billings, an orthopedic surgeon, did the bone fusion. Following surgery, plaintiff was not seen again by Dr. Richardson until April of 1986, because Dr. Billings took over treatments during recovery from the fusion procedure. Dr. Billings described a fusion procedure as one in which pieces of bone from the pelvis are placed in the spaces previously occupied by the discs in the spinal column. Over time, these bone fragments solidify with the vertabrae and prevent movement in the spine which might adversely affect the spinal cord and nerves at the point of fusion.
By December, 1986, Dr. Billings was of the opinion that because the plaintiff was still experiencing intermittent pain, he would not consider the results of the surgery excellent, but he nonetheless considered it an acceptable surgical response. He further assigned him a 15% whole body anatomical impairment, with permanent restrictions on prolonged standing or sitting, repetitious bending and stooping, and heavy lifting. In addition, he thought that plaintiff would require continued medical treatment, possibly for life, to keep his back problem under control, at an estimated cost of $1,500 per year. While he did not rule out the possibility of future surgery, he thought there was less than a 30% chance that this would be required. He also noted that he found that plaintiff had steadily improved since surgery and expected this to continue. He further stated that plaintiff's pain was not an every-waking-moment type pain, but rather that it came and went depending on the level of activity. In regard to future employability, he recommended that within another three months plaintiff should seriously consider enrolling in either a college program or vocational training, possibly for some type of bench work where he could use his upper body, and which involved alternate standing and sitting.
During a neurological evaluation of plaintiff made by Dr. Richardson over a year after the surgery, it was noted that he had complaints of a tingling in his left hand while urinating, has back pain during bowel movements, and leg pain during intercourse. The doctor could not explain the cause of these symptoms with medical certainty, but found no reason to disbelieve that they existed. He further reported that plaintiff was making progress in his recovery, but was a bit more guarded in his prognosis than that of Dr. Billings in that he felt that the ultimate outcome of the surgery would not be known with any certainty for another six to twelve months. He did concur with Dr. Billings' assessment of future employability, assuming that the fusion was successful.
*21 In regard to plaintiff's future work potential, he called Judith Lide, a vocational rehabilitation expert. Ms. Lide testified that Lewis is a highly motivated, work ethic type of person whom she would expect to get a job and keep it once he is physically able to return to work. She also found him a bright individual whom she thought could handle the educational requirements of college work or vocational training. She further testified that without retraining, he would only be able to find minimum wage jobs, but that after training for some type of bench work, such as a dental technician, his expected salary would be six to eight dollars per hour.
Plaintiff's economic expert, Dr. Seymour Goodman, testified that if he were able to get only a minimum wage job, his future lost earnings would be $625,519.97. At a salary of $15,000 per year, beginning two years from the trial, the loss would be $479,373.54. His calculation for lost wages up to the time of trial was $104,241.83, and the discounted value of future medical expenses at $1,500 per year came to $28,820.46.
Based on the above evidence, the trial judge awarded damages as follows:

Past Due Wages $104,241.83
Future Lost Wages 625,518.97
Less Workman's Compensation 35,319.00
Past Pain and Suffering 375,000.00
Future Pain and Suffering 150,000.00
Future Medical Expenses 10,000.00
 _____________
 Total: $1,229,441.80

The appellants urge that the trial judge committed manifest error in concluding that plaintiff would be limited to minimum wage jobs, and thus awarding future lost wages based on that assumption. They argue further that he abused his much discretion in awarding $525,000 in general damages. By answer to the appeal, plaintiff urges that it was error to award him only $10,000 in future medical expenses.
As to damages for future lost wages, because ascertainment of this figure depends on factual findings, the rule to be followed is whether the trier of fact committed manifest error in making these findings. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Our review of the record compels us to conclude that such error was committed here insofar as the trial court found that plaintiff will be limited to minimum wage jobs. The testimony of plaintiff's own expert, Ms. Lide, clearly indicates that plaintiff is a bright individual, and plaintiff testified that he had a year and a half of college work. Ms. Lide further noted that he is well motivated and felt that once he was physically able to work he would find a job and keep it. It was her further opinion that he had the capacity to be retrained in some bench type trade where he could earn from 6 to 8 dollars per hour, or between $12,480 and $16,640, per year. It is clear that the trial judge concluded that plaintiff will be able to return to employment within a year or two after trial, and we find no error in this conclusion. However, the other evidence shows clearly that when plaintiff can return to work, because of his intelligence and motivation, he could readily be retrained for a job paying in the $15,000 per year range.
We also find no error in the trial judge crediting the testimony of plaintiff's expert over that of the defendants. Therefore, using Dr. Goodman's figures, based on the assumption that plaintiff will be able to earn $15,000 per year, we hold that the proper award for future lost wages is $479,373.54.
As to future medical expenses, Dr. Billings stated that a fair estimate for this item would be $1,500 per year. He also stated that the chances for future surgery were less than 30%. This evidence was not seriously refuted. Again using Dr. Goodman's figures, we hold that plaintiff is entitled to an award for future medical care in the amount of $28,820.40.
We next turn to the general damage award of $525,000. Here, the inquiry is whether the trier of fact abused his much discretion in fixing this award, Coco v. Winston Industries, Inc., 341 So.2d 332 *22 (La.1977); Reck v. Stevens, 373 So.2d 498 (La.1979).
We have summarized the medical evidence above and need not repeat it here. We do note that plaintiff testified that the pain in his back has been constant, although of a severity which varies according to his activity level. He also testified that prior to the accident he enjoyed physically robust activities such as jogging, martial arts, and occasional fishing, all activities in which he can no longer participate. We also note his testimony that he has become irritable with his wife, that his outlook is not too bright, and that he and his wife have delayed having children because of physical and financial uncertainties.
On the other hand, it is apparent that plaintiff's pain was not of such severity, before the surgery as to completely debilitate him. He continued on his job, although on light duty, for almost two years after the accident. Similarly, he waited another 14 months after the diagnosis of two ruptured discs before having surgery, even though the expense of the operation was to be borne by his former employer. Additionally, although he mentions being depressed, there was no showing that this problem required psychiatric intervention. His treating physicians, while unable to state with certainty what the prognosis for his recovery might be, were nonetheless optimistic that he would improve over time, and Dr. Billings was also of the opinion that he would be able to return to some useful employment.
While we do not suggest that Mr. Lewis has not suffered both physically and mentally because of this accident, we nonetheless find that on the particular facts of his physical injury and the impact which this injury has had on his life, an award of $525,000, for general damages is excessive and constitutes an abuse of the much discretion of the trier of fact.
Having so found, our next task is to determine what is the highest amount, on these particular facts, which the trier of fact could reasonably have awarded without abusing his discretion. At this point, we may seek guidance from prior awards in similar cases, ever mindful, of course, that these other cases are in fact similar to the matter under consideration.
We have carefully reviewed the cases brought to our attention by all parties to this litigation, and find two that are, in this court's opinion, truly similar to the facts before us.
In Brown v. Southern Farm Bureau Ins. Co., 426 So.2d 684 (La. App. 1st Cir. 1983), the court affirmed a general damage award of $150,000 for injuries to a 40 year old plaintiff necessitating disc removal and fusion surgery. After two surgical interventions, this plaintiff was left with headaches, numbness in the extremities, acute depression, insomnia, poor appetite and nervousness. In addition, he was found incapable of performing any job, other than at minimum wage, because he had little education and his prior work consisted of manual labor. In Wilson v. Wal Mart Stores, Inc., 448 So.2d 829 (La. App. 2nd Cir.1984) the court affirmed a general damage award of $100,000 for injury to a plaintiff which required disc surgery, as well as repeated re-hospitalizations for epidural nerve blocks for pain. She further was assessed a 20% permanent disability and was diagnosed by a psychiatrist as suffering from anxiety neurosis. Further, she was able to return to work on a part time basis, gradually increasing her employment to full time.
Comparing these cases to the one before us, it is clear that the plaintiff in Brown suffered greater consequences from his injuries than the plaintiff here, in that two surgeries were performed, and the residual effects were more severe. In Wilson, although no fusion was done in conjunction with the disc removal, the plaintiff nonetheless underwent a number of subsequent hospitalizations for epidural nerve blocks, and suffered a 20% residual disability.
After careful review of the particular facts of this case, and with reference to the above similar cases, this court concludes that the highest general damage award which the trier of fact could have given without abusing his much discretion is *23 $125,000. We therefore fix the general damage award for past and future pain and suffering at that amount.
The fourth issue concerns legal interest and costs. As to legal interest, La. R.S. 13:4203, mandates that in actions ex delicto, legal interest attaches from date of judicial demand. This interest attaches automatically until judgment is paid, even if not prayed for or not mentioned in the judgment, and is applicable to the entire quantum of the judgment, whether it be for past or future losses, Broome v. Gauthier, 443 So.2d 1127 (La.App. 4th Cir. 1983); Schackai v. Tenneco Oil Co., 436 So.2d 729 (La.App. 4th Cir.1983). The defendants are thus liable for legal interest from date of judicial demand under the above rules.
In regard to costs, La.Code Civ.Pro. art. 1920, is controlling. That article states that "unless the judgment provides otherwise, costs shall be paid by the party cast...." (emphasis added.) Thus, where a judgment is silent as to costs, as in the present case, they shall be paid by the parties cast in judgment, and we so rule.
The final issue is whether Matlack is entitled to judgment for damages to its truck. It was stipulated at trial that the costs of repairs to the truck were $11,381.74. Having affirmed that the negligence of David Miller was the sole cause of the accident, we render judgment in the above amount in favor of Matlack, Inc., and against David Miller, Macke Building Services, Inc. and P.M.A. Insurance Company.

DECREE
For the reasons assigned, the judgment of the trial court is amended to reflect the following damage awards for Charles A. Lewis:

Past Due Wages $104,241.83
Future Lost Wages 479,373.54
Less Workman's Compensation 35,319.00
Past & Future Pain &
Suffering 125,000.00
Future Medical Expenses 28,820.46
 ____________
 Total: $702,116.83

The judgment is further amended to delete Fireman's Fund Insurance Company as a party cast in judgment.
The defendants, David Miller, Macke Building Services, Inc. and P.M.A. Insurance Co., are liable for legal interest from the date of judicial demand and are liable for all costs in this matter, both in the trial court and on appeal.
In case No. 87-CA-720 judgment is rendered in favor of Matlack, Inc. and against David Miller, Macke Building Services, Inc. and P.M.A. Insurance Company in the amount of $11,381.74.
In all other aspects the judgment appealed is affirmed.
AFFIRMED AS AMENDED.
GAUDIN, J., concurs with written reasons.
GAUDIN, Judge, concurring.
I fully concur in the foregoing opinion insofar as it (1) removes Fireman's Fund from the judgment, (2) affirms the finding that David Miller's negligence was the sole cause of the sued-on accident, (3) requires the responsible defendants to pay interest and costs and (4) awards Matlack, Inc. the sum of $11,381.74 for truck repairs.
I also concur in the lowering of the award to Charles Lewis and believe that a further reduction would be appropriate.